**William CLYNCH, Plaintiff,**

v.

**Steve CHAPMAN, James Garofalo, and Salvatore Froschino, Defendants.**

No. 3:01CV1685(JBA).

United States District Court,
D. Connecticut.

Sept. 30, 2003.

Raymond J. Kelly, James P. Mooney, Kelly and Mooney, Fairfield, CT, for James Garofalo.

John R. Williams, Williams & Pattis, New Haven, CT, for William Clynch.

### Ruling on Defendants' Motion for Summary Judgment
[Doc. # 18]

ARTERTON, District Judge.

Plaintiff William Clynch ("Clynch") brings this suit against defendants Steve Chapman ("Chapman"), James Garofalo ("Garofalo"), and Salvatore Froschino ("Froschino"), police officers employed by the City of Derby, Connecticut, in their individual capacities only, alleging federal and state constitutional violations, and violations of Connecticut common law arising from his arrest on November 1, 2000 for driving under the influence ("DUI") in violation of Conn. Gen.Stat. § 14–227a(a)(1).[1]

1. The DUI statute has been frequently amend- ed. Unless otherwise specified, all references

Under 42 U.S.C. § 1983, Clynch asserts the following claims against defendants: 1) against Chapman: violations of the Fourth Amendment (*Terry* stop without articulable suspicion, false arrest, malicious prosecution, and unreasonable seizure of Clynch's automobile); violation of procedural and substantive due process under the Fourteenth Amendment; violation of the excessive bail clause of the Eighth Amendment; and violation of the Ninth Amendment; 2) against Garofalo: the same violations as against Chapman (excluding the *Terry* stop and excessive bail claims) either directly or for failure to prevent Chapman's violations; 3) against Froschino: failure to prevent Chapman's Eighth Amendment violation; 4) state constitutional claims against Chapman and Garofalo for unreasonable search and seizure and unwarranted arrest and detention in violation of Conn. Const. art. I, §§ 7 & 9; and 5) intentional infliction of emotional distress against all three defendants.

Defendants move under Fed.R.Civ.P. 56 for judgment in their favor on Clynch's claims of false arrest, procedural due process, excessive bail, Ninth Amendment violation, violation of the Connecticut Constitution, and intentional infliction of emotional distress. For the reasons set forth below, their motion [Doc. # 18] is GRANTED in PART and DENIED in PART.

## I. Factual Background

Clynch, a 69 year old man who has lived his entire life in the same house in Derby, Connecticut, was employed for 42 years with the United Illuminating Company ("UI"), served as a Derby alderman for several years, and held the position of Derby Parks Commissioner for roughly 30 years.

On November 1, 2000, Clynch attended mass at Saint Joseph's in Shelton, Connecticut with Mary Ellen Ramia, his girlfriend. They left mass at 6:45pm and went to an establishment known as "Franco's," at which Clynch consumed snacks and two beers over the course of an hour or more. Between 8:30pm and 9:00pm, Clynch and Ramia left Franco's in Clynch's automobile intending to stop for dinner at a nearby restaurant.

Clynch was driving slowly at 15–20 miles per hour when he noticed a police car following him with its head lights out. Then suddenly at 9:08pm, Derby police officer Chapman turned on the police car's siren and overhead lights and pulled Clynch over to the side of the road. Clynch emphatically maintains that he was pulled over for no reason, that, from the time he left Franco's until being pulled over, he had obeyed all rules of the road, had maintained a steady course in his own lane, and had not swerved into neighboring lanes or crossed a solid white line. By contrast, Chapman reports that Clynch was weaving in his own lane, crossed a solid white line on one occasion, and, on at least two other occasions, crossed into a neighboring lane of traffic before returning to his own lane.

Chapman spent fifteen to twenty minutes checking Clynch's driver license and registration, after which time fellow officer defendant Garofalo arrived. Both Chapman and Garofalo report that they smelled alcohol emanating from Clynch's automobile, saw Clynch's eyes were bloodshot and glassy, and heard a slight slur in Clynch's speech. Clynch believes the alcohol smell came from the beers he had consumed at

to it in this opinion are to Conn. Gen.Stat. § 14–227a as it was codified at the time of Clynch's arrest on November 1, 2000.

Franco's and explains that he "could have been slurred all over the place" as a result of his nervousness at having been stopped by police. Clynch also told Chapman that he had consumed a few beers.

Chapman ordered Clynch to the nearby parking lot of Saint Michael's church, which, although paved, was on a hill, and ordered him to perform three field sobriety tests: an eye test, a turn and walk test, and a one legged stand test. According to Chapman and Garofalo, Clynch was unable to perform any of the three tests in a satisfactory manner. He was unable to follow a pen in Chapman's hand with his eyes, he was unable to walk heel to toe and toe to heel in a straight line without losing balance, and, although being provided with several chances, he was unable to stand on one leg with the other leg raised six inches without losing balance. Also according to Chapman and Garofalo, Chapman explained and demonstrated each test to Clynch before asking him to perform them, and Clynch assured the officers that there was no medical problem which could interfere with his performance.

Clynch vigorously disputes some of the officers' account of the field sobriety tests. He maintains that he successfully completed the eye test, that he explained to Chapman that his injured left knee caused him to be unable to perform the walk and turn and one leg tests without losing balance, that he never informed the officers that he had no medical problems that would prevent proper performance, and that he was only given one chance to perform the one legged test.

When Chapman arrested Clynch, Clynch claims he put the handcuffs on so tightly that he broke Clynch's wristwatch, a retirement gift from UI. Clynch's automobile was impounded, and he was taken to the police station and put in a holding cell. When Clynch wanted to use the restroom, Chapman told him he would have to wait. After speaking with an attorney and reading a "Notice of Rights" and an implied consent advisory from an A–44 form, Clynch consented to breathalyzer analysis. The first test, given at 10:06pm, revealed a blood alcohol level ("BAC") of .061 and the second, given thirty-five minutes later at 10:40p.m., revealed a BAC of .056.

After the breathalyzer tests, Chapman returned Clynch to a cell with a restroom. Subsequently, he retrieved Clynch from his cell, charged him with DUI, ordered him held on a surety bond of $500, set a court date of November 17, 2000, and returned him to a cell until a bondsman arrived and gave him a ride home. Clynch's bond was set in accordance with Derby Police Departmental standard operating procedure for the sum that is automatically required as bond for a DUI arrest.[2] Before Clynch left the station, Chapman returned his driver's license. The following morning, Clynch was told the location to which his automobile had been towed, and he paid $73.00 to get his automobile back. Chapman and Garofalo both prepared incident reports.

At plaintiff's court appearance on November 17, 2000, the state's attorney stated, "[r]eadings were a .061 … The state does not have prima facie evidence to convict and will enter a nolle." Clynch's lawyer stated, "we acknowledge probable cause. If the court would entertain a dismissal?" The presiding judge then dismissed the charges. Clynch maintains that he never authorized his lawyer to admit probable cause for his arrest, and

---

**2.** Releasing Clynch on personal recognizance was prohibited under Conn. Gen.Stat. § 14– 140.

that, due to his nervousness and desire to leave the courthouse as quickly as possible, he did not even hear what was said in colloquy with the judge that morning.

Plaintiff maintains that he suffered emotional distress as a result of the incident, including ongoing humiliation from "public scorn" and comments of Derby citizens, his girlfriend's family, and his own family to the effect that he is the town drunk. Clynch has not sought medical attention or counseling for his distress.

## II. Defendants' Motion

Although defendants' motion is labeled as one for "summary judgment," their attack on Clynch's Eighth, Ninth, and Fourteenth Amendment claims is directed only to the allegations of Clynch's complaint. Accordingly, the Court will treat defendants' motion on those claims as made under Fed.R.Civ.P. 12(b)(6). *See* 10A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice and Procedure: Civil 3d § 2722, at 368 (1998 & Supp.2003) ("Federal Practice") ("... [I]f the [summary judgment] motion is made solely on the basis of one or more pleadings, it is equivalent to a motion under Rule 12(b)(6) for a dismissal for failing to state a claim for relief or under Rule 12(c) for a judgment on the pleadings and should be treated as such." (citing cases)).

In analyzing the issue of supervisory liability,[3] defendants have misapprehended the gist of Clynch's poorly drafted complaint, which lacks allegations asserting a theory of supervisory liability. Rather, with respect to Froschino, the complaint (as developed by Clynch's deposition testimony) asserts liability for failing to intervene to protect Clynch from the imposition of excessive bail, and, with respect to Ga-

rofalo, the complaint (also as developed by the summary judgment record) is best read as asserting both direct liability, and indirect liability for failing to intervene to prevent Chapman's false arrest of plaintiff.

## III. Standard under Fed.R.Civ.P. 12(b)(6)

When deciding a motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim which would entitle plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.").

### A. Ninth Amendment

■ In the penultimate paragraph of his complaint, Clynch summarizes his claims:

In the manner described above, the defendants subjected the plaintiff to false arrest, unreasonable arrest, malicious prosecution, unreasonable seizure of his property, excessive and unreasonable bail bond, and a deprivation of both procedural and substantive due process of law, all in violation of the Fourth, Eighth, Ninth, and Fourteenth Amend-

---

**3.** Plaintiff's opposition brief unhelpfully contains no response on the subject of defen-

dants' supervisory liability.

ments to the United States Constitution as enforced through Sections 1983 and 1988 of Title 42 of the United States Code.[4]

Defendants argue that the Ninth Amendment does not provide an independent basis for relief under 42 U.S.C. § 1983 because it is a rule of construction rather than a source of individual rights. Plaintiff does not respond. Defendants are correct.

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred,'" *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (*quoting Baker v. McCollan*, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)), and the great weight of authority has held that the Ninth Amendment is not an independent source of rights. *See Froehlich v. Wisconsin Dept. of Corrections*, 196 F.3d 800, 801 (7th Cir.1999) ("The Ninth Amendment is a rule of interpretation rather than a source of rights.... Its purpose is to make clear that the enumeration of specific rights in the Bill of Rights is not intended (by the interpretive principle expressio unius est exclusio alterius) to deny the existence of un-enumerated rights."); *Vega–Rodriguez v. Puerto Rico Telephone Co.*, 110 F.3d 174, 182 (1st Cir.1997); *Schowengerdt v. U.S.*, 944 F.2d 483, 490 (9th Cir.1991); *Gibson v. Matthews*, 926 F.2d 532, 537 (6th Cir.1991); *Strandberg v. City of Helena*, 791 F.2d 744, 748–49 (9th Cir.1986).[5] It may permit locating un-enumerated fundamental liberty interests or rights in the Fifth or Fourteenth Amendments. *See Griswold v. Connecticut*, 381 U.S. 479, 493, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring). Accordingly, Clynch's Ninth Amendment claim is dismissed for failure to state a claim.

## B. Eighth Amendment Excessive Bail Claim and Judicial Immunity[6]

The essence of Clynch's excessive bail claim is that Chapman imposed an automatic bond of $500.00 upon Clynch without assessing individualized factors, including

---

**4.** As is evident from defendants' motion, this *en masse* form of pleading, which fails to set out which conduct is alleged to abridge which constitutional provision, unnecessarily consumes party and court resources to sort out and thus would have been a proper candidate for a motion for more definite statement under Fed.R.Civ.P. 12(e).

**5.** *See also DeLeon v. Little*, 981 F.Supp. 728, 734 (D.Conn.1997); *Williams v. Perry*, 960 F.Supp. 534, 540 (D.Conn.1996).

**6.** Defendants do not raise the issue of judicial immunity with respect to the bail setting functions of Chapman (or Froschino) as police officers. This does not preclude the Court from raising the immunity question on its own, especially where the defendants have invoked the cousin issue of qualified immunity. *See Jean v. Collins*, 155 F.3d 701, 705 n. 1 (4th Cir.1998) (en banc) ("The officers did plead the defense of qualified immunity, however, and we may properly consider the closely related question of the scope of the immunity to which they are entitled.... Failure to do so here would create the possibility that qualified immunity would incorrectly be accepted as the limit of protection for police officers performing functions that require the exercise of prosecutorial discretion.") (citation and quotation omitted), *judgment vacated on other grounds by* 526 U.S. 1142, 119 S.Ct. 2016, 143 L.Ed.2d 1029 (1999). The Court also notes that, at the motion to dismiss/summary judgment stage, Chapman has not waived the defense of absolute immunity, *see* Fed.R.Civ.P. 12(g) & (h)(2); *Krohn v. U.S.*, 742 F.2d 24, 29 (1st Cir.1984), and that, in contrast to a qualified immunity analysis, it is proper to first address the applicability of absolute immunity before assessing whether a plaintiff's allegations sufficiently allege a constitutional violation, *see Pinaud v. County of Suffolk*, 52 F.3d 1139, 1148 n. 4 (1995).

Clynch's lifelong residence and standing in Derby and lack of criminal record. This claim must be dismissed because Chapman and Froschino are absolutely immune from personal-capacity suits for monetary damages[7] under 42 U.S.C. § 1983 for actions related to performing the bail setting function assigned to Connecticut police officers under Conn. Gen.Stat. § 54–63c.[8] *See Sanchez v. Doyle*, 254 F.Supp.2d 266, 269–273 (D.Conn.2003).

■ "It is … well established that officials acting in a judicial capacity are entitled to absolute immunity against § 1983

7. For discussion on the distinction between personal-capacity suits and official-capacity suits, *see generally Hafer v. Melo*, 502 U.S. 21, 25–26, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Kentucky v. Graham*, 473 U.S. 159, 165–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir.1993). Among other differences, official-capacity suits raise immunity issues under the Eleventh Amendment whereas personal-capacity suits are limited to absolute and qualified immunity defences. *See id.*

8. Conn. Gen.Stat. § 54–63c provides,

(a) Except in cases of arrest pursuant to a bench warrant of arrest in which the court or a judge thereof has indicated that bail should be denied or ordered that the officer or indifferent person making such arrest shall, without undue delay, bring such person before the clerk or assistant clerk of the superior court for the geographical area under section 54–2a, when any person is arrested for a bailable offense, the chief of police, or his authorized designee, of the police department having custody of the arrested person shall promptly advise such person of the person's rights under section 54–1b, and of the person's right to be interviewed concerning the terms and conditions of release. Unless the arrested person waives or refuses such interview, the police officer shall promptly interview the arrested person to obtain information relevant to the terms and conditions of the person's release from custody, and shall seek independent verification of such information where necessary. At the request of the arrested person, the person's counsel may be present during the interview. After such a waiver, refusal or interview, the police officer shall promptly order release of the arrested person upon the execution of a written promise to appear or the posting of such bond as may be set by the police officer, except that no condition of release set by the court or a judge thereof may be modified by such officer and no person shall be released upon the execution of a written promise to appear or the posting of a bond without surety if the person is charged with the commission of a family violence crime as defined in section 46b–38a, and in the commission of such crime the person used or threatened the use of a firearm. When cash bail in excess of ten thousand dollars is received for a detained person accused of a felony, where the underlying facts and circumstances of the felony involve the use, attempted use or threatened use of physical force against another person, the police officer shall prepare a report that contains (1) the name, address and taxpayer identification number of each person offering the cash bail, other than a person licensed as a professional bondsman under chapter 533 or a surety bail bond agent under chapter 700f, (3) the amount of cash received, and (4) the date the case was received. Not later than fifteen days after receipt of such cash bail, the police officer shall file the report to the state's attorney for the judicial district in which the alleged offense was committed and to each person offering the cash bail If the arrested person has not posted bail, the police officer shall immediately notify a bail commissioner.

(b) The chief, acting chief, superintendent of police, the Commissioner of Public Safety, any captain or lieutenant of any police department or the Division of State Police within the Department of Public Safety or any person lawfully exercising the powers of any such officer may take a written promise to appear or a bond with or without surety from an arrested person as provided in subsection (a) of this section, or as fixed by the court or any judge thereof, may administer such oaths as are necessary in the taking of promises or bonds and shall file any report required under subsection (a) of this section.

An amended version of the statute will take effect on October 1, 2003. The amendments are not material to the present discussion.

actions, and this immunity acts as a complete shield to claims for money damages." *Montero v. Travis,* 171 F.3d 757, 760 (2d Cir.1999). The critical inquiry focuses on the nature of the act being performed and not on the status of the individual performing it. *See Forrester v. White,* 484 U.S. 219, 224, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) ("It is the nature of the function performed, not the identity of the actor who performed it, that informed our immunity analysis."); *see also Cleavinger v. Saxner,* 474 U.S. 193, 201, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (*quoting Butz v. Economou,* 438 U.S. 478, 511, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)) ("[A]bsolute immunity flows not from rank or title or 'location within the Government,' ... but from the nature of the responsibilities of the individual official."). Thus, judicial immunity may extend to parole board officials who serve in a quasi-adjudicative function in deciding whether to grant, deny, or revoke parole, *see Montero,* 171 F.3d 757, but not to a judge who performs administrative, legislative, or executive functions, such as discharging an employee, *see Forrester,* 484 U.S. at 229, 108 S.Ct. 538.

Under this functional approach, the Court examines "the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and ... seek[s] to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Id.* at 224, 108 S.Ct. 538. To facilitate this analysis, the Second Circuit has extracted a two-part test from the Supreme Court's decision in *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), to determine whether a judge (or other official performing a judicial function) is enti-

tled to absolute immunity: "First, a judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the *clear absence of all jurisdiction* ...[;][s]econd, a judge is immune only for actions performed in his judicial capacity." *Tucker v. Outwater,* 118 F.3d 930, 933 (2d Cir.1997) (quotation and citation omitted) (emphasis in original); *see also Montero,* 171 F.3d at 761 n. 2.[9]

■ Setting bail is a judicial act. *Tucker,* 118 F.3d at 933; *see also Cleavinger,* 474 U.S. at 206, 106 S.Ct. 496 ("Petitioners ... refer to well-known summary and *ex parte* proceedings, such as the issuance of search warrants and temporary restraining orders, and the setting of bail."). Chapman's and Froshino's roles in setting Clynch's bail were "functionally comparable to that of a judge." *Butz,* 438 U.S. at 513, 98 S.Ct. 2894. To set bond, Conn. Gen.Stat. §§ 54–63c(a) requires the officer to attempt to conduct an interview with the arrested person to obtain information relevant to the terms and conditions of the person's release from custody such as the nature and circumstances of the offense insofar as they are relevant to the risk of nonappearance, defendant's record of previous convictions, past record of appearance in court after being admitted to bail, family ties, employment record, financial resources, character and mental condition, and community ties. *See* Conn. Gen.Stat. §§ 54–63c(a) and § 54–63b(a) and (c). Weighing those factors to determine the appropriate bond demonstrates "independent judgment," *Butz,* 438 U.S. at 513, 98 S.Ct. 2894, especially in light of the fact that, if the arrested person posts the bail set by the officer, the officer's deter-

**9.** Clynch's complaint does not allege that either Chapman or Froschino were not officers authorized to set bail under Conn. Gen.Stat. § 54–63c.

mination is not reviewed and the arrested person is released until arraignment (as happened in Clynch's situation). In addition, when the arrested person cannot post the officer-determined bond and the officer is required to refer the matter to a bail commissioner, *see* Conn. Gen.Stat. §§ 54–63c(a), 54–63d(a), & 54–63b(a), the police department retains statutory discretion to advise the state's attorney of its objection to a bail commissioner's redetermination such that the state's attorney may then authorize it to delay release pending a hearing before a superior court judge, *see* Conn. Gen.Stat. § 54–63d(d).[10] In setting bail, therefore, officers like Chapman and Froschino cannot be said to perform merely administrative functions, *see King v. Simpson,* 189 F.3d 284, 288 (2d Cir.1999), but rather are serving independent judicial functions and exercising independent judgment in setting and reviewing bail conditions.

All of plaintiff's bases for claiming Chapman's "clear absence of all jurisdiction" constitute variants of bad faith in setting Clynch's bail and thus are irrelevant to the absolute immunity calculus. *See Mireles v. Waco,* 502 U.S. 9, 11, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991) ("[J]udicial immunity is not overcome by allegations of bad faith or malice . . . ."). Chapman's failure to consider individualized circumstances as required under Conn. Gen.Stat. §§ 54–63c, 54–63b(a) and (c) does not state a claim of clear absence of all subject matter jurisdiction. Even if the Derby Police Department's policy of automatic bail is at variance with Conn. Gen.Stat. § 54–63c(a), the general function of setting bail was within Chapman's statutory authority. *See Mi-*

*reles,* 502 U.S. at 13, 112 S.Ct. 286; *Tucker,* 118 F.3d at 934–36; *See also Jacobson v. Schaefer,* 441 F.2d 127 (7th Cir.1971) (absolute immunity shields county judge who set bail with unlawful conditions).

Granting absolute immunity to Chapman for performing the bail related function of his position serves the underlying purpose of judicial immunity, which is to "free[ ] the judicial process from harassment or intimidation," *Forrester,* 484 U.S. at 226, 108 S.Ct. 538. "If judges were personally liable for erroneous decisions, the resulting avalanche of suits, most of them frivolous but vexatious, would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits." *Id.* at 226–27, 108 S.Ct. 538; *see Montero,* 171 F.3d at 760. These concerns also have applicability to police officers with bail setting authority who would otherwise potentially be subjected to suit by any individual disappointed with bail conditions which he or she could not meet.

Adequate safeguards are in place to protect against constitutional violations which reduce the need for private damage actions. *See Butz,* 438 U.S. at 512, 98 S.Ct. 2894. Counsel may be present during the bail interview, *see* Conn. Gen.Stat. § 54–63c(a), the arrested person has a right to prompt review of the officer's bail determination if bond has not been posted, *see* Conn. Gen.Stat. §§ 54–63c(a) and 54–63d(a), and, should a prosecutor authorize delaying release after police objection to a bail commissioner's redetermination, *see* Conn. Gen.Stat. § 54–63d(d), such delay lasts only "until a hearing can be had before the court then sitting for the geo-

---

10. Conn. Gen.Stat. § 54–63d(d) provides,

The police department shall promptly comply with the order of release of the bail commissioner, except that if the department objects to the order or any of its conditions, the department shall promptly so advise a state's attorney or assistant state's attorney, the bail commissioner and the arrested person. The state's attorney or assistant state's attorney may authorize the police department to delay release, until a hearing can be had before the court . . . .

graphical area ... or, if the court is not then sitting, until the next sitting of said court." *Id.* Accordingly, defendants Chapman and Froschino are entitled to dismissal of plaintiff's excessive bail claim as barred by absolute immunity.

### C. Fourteenth Amendment

#### 1. Substantive Due Process

Defendants attack plaintiff's malicious prosecution claim, which they construe as brought under the Fourteenth Amendment's substantive due process provisions, on the grounds that *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) only permits a malicious prosecution claim to be brought under the Fourth Amendment. While defendants are correct about *Albright, see Singer v. Fulton County Sheriff,* 63 F.3d 110, 114–116 (2d Cir.1995), their narrow interpretation of plaintiff's complaint is flawed because there is no indication in the complaint that plaintiff predicates his malicious prosecution claim on substantive due process instead of the Fourth Amendment. While the complaint is certainly ambiguous as to what constitutional hook Clynch's malicious prosecution claim hangs on, it can be read as based on the Fourth Amendment. Accordingly, defendants' motion to dismiss this claim as brought under the Fourteenth Amendment is granted but as brought under Fourth Amendment is denied.

#### 2. Procedural Due Process

Defendants assert that Clynch's complaint fails to claim that he was denied liberty or property without adequate notice and hearing protections. Plaintiff's opposition brief fails to respond to defendants' arguments, and never mentions procedural due process.

■ Notwithstanding the absence of any direction from plaintiff, the Court locates language which approaches a claim of a denial of procedural due process in paragraph thirteen:

> ... [D]efendant Chapman maliciously had the plaintiff's car towed away and thereby not only deprived the plaintiff of transportation but forced the plaintiff to spend seventy-three dollars to reclaim the vehicle.

Compl. ¶ 13. While there is a well developed body of case law recognizing the liberty interest at stake in the temporary loss of the use of an automobile and analyzing the dispatch with which governmental bodies must afford post-deprivation hearings to owners of impounded or seized vehicles,[11] plaintiff makes no claim of the absence or inadequacy of any post-deprivation hearing following the impoundment of his vehicle, and, accordingly, fails to state a procedural due process claim. Further, even if plaintiff's complaint is read to assert a pre-deprivation constitutional right to notice and hearing before the police impound a DUI arrestee's vehicle, the Court is aware of no authority for such a claim. *Cf. Sutton v. City of Milwaukee,* 672 F.2d 644, 645 (7th Cir.1982)(discussing as question of first impression "whether it is a denial of due process to tow a person's illegally parked car without giving him notice and an opportunity to be heard before the car is towed"). In the absence of any authority, plaintiff's procedural due process claim is dismissed.

### IV. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, an-

---

11. *See e.g. City of Los Angeles v. David,* 538 U.S. 715, 123 S.Ct. 1895, 1897, 155 L.Ed.2d 946 (2003); *Krimstock v. Kelly,* 306 F.3d 40, 44 (2d Cir.2002) ("A car or truck is often central to a person's livelihood or daily activities.").

swers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Where, as here, the non-moving party bears the burden of proof at trial, the party moving for summary judgment may satisfy its initial burden of production by demonstrating the absence of a genuine issue of material fact on an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once that burden is met, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c) and (e)).

"A District Court must resolve any factual issues of controversy in favor of the non-moving party," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), mindful that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The district court's ultimate concern is to ascertain "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

## A. Fourth Amendment

Deciphering Clynch's complaint, there are four claims under the Fourth Amendment: unreasonable stop, false arrest, malicious prosecution, and unreasonable seizure of his automobile. While defendants' motion is directed only to the false arrest claim, the record is sufficiently complete to address aspects of the first three and to narrow the issues for trial.

### 1. Unreasonable Stop

■ Investigative stops made pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny require police officers to have a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *U.S. v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995) (*quoting U.S. v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). "The requisite level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* (quotation omitted). Here, if a jury credited officer Chapman's account, that Clynch crossed a solid white line, was weaving within his own lane, and crossed over the lines of his own lane into neighboring lanes, a *Terry* stop would be justified as such facts articulate reasonable suspicion that Clynch was driving under the influence in violation of Conn. Gen.Stat. § 14–227a(a).[12] By contrast, if a jury credited

---

12. Conn. Gen.Stat. § 14–227a(a), as of November 1, 2000, provided as follows:

(a) Operation while under the influence or while having an elevated blood alcohol content. No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if such person operates a motor vehicle on a public highway of this state or on any road of a district organized under the provisions of chapter 105, a purpose of which is the construction

Clynch's account, the jury could conclude that officer Chapman lacked reasonable suspicion to pull Clynch over. While reasonable suspicion may not require any actual violation of laws,[13] it requires at least some type of unusual circumstance to make an officer believe a crime is being committed. The parties' conflicting contentions about Clynch's driving conduct that night, and thus what the defendants' factual basis was for their actions make summary judgment inappropriate on this claim. Nor have defendants demonstrated their entitlement to qualified immunity at this stage on plaintiff's unreasonable stop claim since, if all inferences are drawn in Clynch's favor—as the Court must do on summary judgment, no reasonable officer could have believed a *Terry* stop was per-

missible where a driver obeyed all rules of the road and did not otherwise appear criminally suspicious. *See Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir.2000).

### 2. False Arrest [14]

The Second Circuit has repeatedly stated that the elements of a claim for false arrest under 42 U.S.C. § 1983 are the same or substantially similar to those for a false arrest claim under New York law, *see e.g., Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir.2003); *Singer*, 63 F.3d at 118; *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir.1992),[15] namely, that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was

and maintenance of roads and sidewalks, or on any private road on which a speed limit has been established in accordance with the provisions of section 14–218a, or in any parking area for ten or more cars or on any school property (1) while under the influence of intoxicating liquor or any drug or both or (2) while such person has an elevated blood alcohol content. For the purposes of this section, "elevated blood alcohol content" means (A) a ratio of alcohol in the blood of such person that is ten-hundredths of one per cent or more of alcohol, by weight, or (B) if such person has been convicted of a violation of this subsection, a ratio of alcohol in the blood of such person that is seven–hundredths of one per cent or more of alcohol, by weight.

**13.** *See e.g., State v. Harrison*, 30 Conn.App. 108, 111, 618 A.2d 1381 (1993) (officer had reasonable suspicion of driving under the influence where he saw defendant's automobile at a bar and shortly thereafter weaving down the road while weaving in its own lane).

**14.** If this were a criminal case and it was concluded that officer Chapman lacked reasonable suspicion to stop Clynch's automobile, the "fruit of the poisonous tree" doctrine might preclude evidence of post stop events and require dismissal of any charges. *See Townes v. City of New York*, 176 F.3d 138,

145–146 (2d Cir.1999). In a § 1983 action, that doctrine does not apply to exclude such evidence and therefore "lack of probable cause to stop and search does not vitiate probable cause to arrest, because (among other reasons) the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant." *Id.* at 149.

**15.** Under Connecticut law, "false imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another," *Green v. Donroe*, 186 Conn. 265, 267, 440 A.2d 973 (1982), requiring that the tortious action include intent to bring about the detention of the plaintiff, *id.* at 268, 440 A.2d 973. Further, "the plaintiff must prove that his physical liberty has been restrained by the defendant and that the restraint was against his will, that is, that he did not consent to the restraint or acquiesce in it willingly." *Lo Sacco v. Young*, 20 Conn.App. 6, 19, 564 A.2d 610 (1989). As such, it is at least identical to the first, third, and fourth ("unlawful") elements of the tort under New York law. The Court need not delve into any potential differences between the common law of Connecticut and New York, or whether such differences would alter the elements required for the § 1983 claim, as defendants here challenge only plaintiff's inability to prove the prong of probable cause to arrest Clynch for a violation of Conn. Gen.Stat. § 14–227a.

not otherwise privileged." *Singer*, 63 F.3d at 118 (quotation omitted).

Defendants claim entitlement to judgment because Chapman had probable cause to arrest Clynch, and "[t]here can be no federal civil rights claim for false arrest where the arresting officer had probable cause." *Id.* " 'Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.' " *Boyd*, 336 F.3d at 75–76 (*quoting Golino v. City of New Haven*, 950 F.2d 864, 870 (1991)).

■ From the time Chapman stopped Clynch's automobile to the time he administered and obtained the results of the second breathalyzer test, Chapman had probable cause to arrest/detain Clynch. Clynch does not dispute that he told Chapman upon being stopped that he had recently consumed beer, that Clynch's eyes were glassy and bloodshot, that his speech was slightly slurred, that he and his car smelled of alcohol, and that Clynch was unable to perform two of the field sobriety tests administered by Clynch. From this, a person of reasonable caution could have believed that Clynch was operating his vehicle in violation of Conn. Gen.Stat. 14–227a, justifying detention and initial arrest. Connecticut courts have consistently agreed in factually analogous situations. *See e.g., Kolakowski v. Hadley*, 43 Conn. App. 636, 643, 685 A.2d 689 (1996)(facts "more than sufficient" for establishing probable cause for arrest for operating a motor vehicle under the influence of alcohol included failing to stop after police officer activated overhead lights on police vehicle, slurred speech, smell of alcohol, severe staggering when walking, droopy expression, and admission of prior drinking).

Even if a jury credited Clynch's assertion that he passed the first field sobriety eye test, and had explained to Chapman his physical impairment that prevented him from performing the second and third tests, no reasonable jury could find lack of probable cause where it is undisputed that the individual demonstrates to the arresting officer an inability to perform moving field sobriety tests, smells of alcohol, slurs his speech, and admits to recent consumption of alcohol.

However, it is plaintiff's contention that Chapman lacked probable cause to maintain continued detention and should have released him immediately after learning the results of the breathalyzer tests, which were .061 and .056 BAC, but instead detained him further in a holding cell before formally charging him under Conn. Gen. Stat. § 14–227a(a) and requiring a surety bond. Plaintiff argues the breathalyzer tests demonstrated to Chapman that he was innocent of a violation under § 14–227a(a), requiring a .1 BAC to support conviction, and therefore, any probable cause to arrest/detain that may have existed to that point evaporated, leaving Chapman no discretion to prolong the detention.

■ Plaintiff's argument fails to differentiate between a violation of 14–227a(a)(1) and 14–227a(a)(2). Under subdivision (2), a BAC rating in excess of .1 automatically qualifies as "operation [of a motor vehicle] while having an elevated blood alcohol content." Under 14–227a(a)(1), under which Clynch was charged and which is considered the "behavioral ... subdivision of [§ 14–227a(a) ]," *State v. Barber*, 42 Conn. App. 589, 590, 681 A.2d 348 (1996), no evidence of blood alcohol content is necessary to support a conviction, *see e.g., State v. Gonzalez*, 210 Conn. 446, 556 A.2d 137 (1989); *State v. Pulaski*, 71 Conn.App. 497, 501–505, 802 A.2d 233 (2002). Thus, a DUI conviction may be predicated on a

driver's behavior even if the driver's BAC rating falls below ten-hundredths of one per cent. The statutory scheme bolsters this interpretation. The use of the disjunctive "or" between the two subdivisions of Conn. Gen.Stat. § 14–227a(a) clearly indicates two separate offenses, the later of which, subdivision (2), requires a defined "elevated blood alcohol content." To impose the same BAC requirement for an arrest under subdivision (1) would effectively negate any qualitative difference between the behavioral and the per se subdivisions. In fact, with respect to a violation of subdivision (1), Conn. Gen.Stat. § 14–227a(d) specifically provides that BAC test results may only be used defensively at trial:

> In any prosecution for violation of subdivision (1) of subsection (a) of this section, reliable evidence respecting the amount of alcohol in the defendant's blood or urine at the time of the alleged offense, as shown by a chemical analysis of the defendant's blood, breath or urine, otherwise admissible under subsection (c) of this section, shall be admissible only at the request of the defendant.

While Clynch's BAC ratings of .061 and .056 would have precluded a person of reasonable caution from believing probable cause existed to continue to detain Clynch for a violation of subdivision (2) of Conn. Gen.Stat. § 14–227a(a), his post-stop behavior coupled with elevated BAC ratings was sufficient for probable cause to arrest under subdivision (1). Further, since "police officers of reasonable competence could disagree as to whether there was probable cause, there is 'arguable' probable cause sufficient to warrant qualified immunity for the defendant officers." *Boyd*, 336 F.3d at 76 (*quoting Martinez*, 202 F.3d at 634). Accordingly, defendants are entitled to summary judgment on plaintiff's false arrest claim.

### 3. Malicious Prosecution

■ In analyzing a § 1983 malicious prosecution claim, the Court makes two inquiries: whether the defendant's conduct was tortious under applicable state law, and whether the plaintiff's injuries resulted from a deprivation of liberty guaranteed by the Fourth Amendment. *See Singer*, 63 F.3d at 110, 114, 116.

■ "The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person— i.e., the right to be free of unreasonable or unwarranted restraints on personal liberty.... A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must therefore show some deprivation of liberty consistent with the concept of seizure," and that deprivation must have been effected " 'pursuant to legal process.' " *Id.* at 116–17 (*quoting Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 2371, 129 L.Ed.2d 383 (1994)). Where, as here, the malicious prosecution claim derives from a warrantless arrest, only post arraignment deprivations of liberty can constitute constitutional seizure. *See id.*

" 'An action for malicious prosecution against a private person requires a plaintiff to prove that: (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice.' " *Lo Sacco*, 20 Conn. App. at 19–20, 564 A.2d 610 (*quoting McHale v. W.B.S. Corporation*, 187 Conn. 444, 447, 446 A.2d 815 (1982)); *see also Vandersluis v. Weil*, 176 Conn. 353, 356, 407 A.2d 982 (1978). With respect to the third element, "[f]or purposes of a vexa-

tious suit action, '[t]he legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it.' . . . 'Probable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." ' *DeLaurentis v. City of New Haven,* 220 Conn. 225, 256, 597 A.2d 807 (1991) (*quoting* respectively *Wall v. Toomey,* 52 Conn. 35, 36 (1884) and *Shea v. Berry,* 93 Conn. 475, 477, 106 A. 761 (1919)).

Defendants move on Clynch's malicious prosecution claim on the ground that it was improperly brought under a substantive due process rationale, not on whether Clynch's release on bond pending judicial disposition of his case constitutes sufficient liberty deprivation to constitute a seizure for purposes of a malicious prosecution claim under § 1983,[16] or whether the record evidence could support a jury finding in plaintiff's favor on the four elements of the corresponding common law tort. Absent any briefing on all elements except probable cause, which is connected to plaintiff's unreasonable stop claim, the Court does not address those elements.

■ Plaintiff's claim would fail on the probable cause element if no triable issue existed on Chapman's authority to effect a *Terry* stop. If Chapman had probable cause to arrest and detain Clynch for DUI as discussed above, he would certainly be reasonable in believing Clynch guilty of a violation of Conn. Gen.Stat. § 14–227a(a)(1) such as to justify setting bond, scheduling a date for Clynch's appearance in court, and the filing of an incident report. However, as it is clearly established that an officer cannot effect a *Terry* stop where there is no suggestion of criminal activity and that the fruits of an unlawful stop would be inadmissible at a criminal trial, Chapman would not have been reasonable in believing there existed probable cause to prosecute if his initial stop of Clynch violated the Fourth Amendment because all the evidence subsequently gathered against Clynch deriving from that unlawful stop would be inadmissible at his criminal trial. *See Boyd,* 336 F.3d at 76–77 (material issue of fact regarding whether incriminating statements were made while in custodial interrogation in violation of *Miranda* precluded granting summary judgment in favor of defendants on plaintiff's malicious prosecution claim because, if such statements were not admissible, no probable cause for prosecution existed).[17] If the jury credits Clynch's story of appropriate driving conduct and concludes that Chapman's stopping Clynch

16. For discussion on whether conditions of pretrial release, including bail, amount to a Fourth Amendment seizure for purposes of a malicious prosecution claim under 42 U.S.C. § 1983, *see Albright,* 114 S.Ct. at 815–816 (Ginsburg, J., concurring); *Nieves v. McSweeney,* 241 F.3d 46, 54–57 (1st Cir.2001); *Murphy v. Lynn,* 118 F.3d 938 (2d Cir.1997) (concluding that post-arraignment obligation to attend court appointments and prohibition against leaving the state of New York constituted a Fourth Amendment seizure); *Singer,* 63 F.3d at 117 and n. 6.

17. While the fruit of the poisonous tree doctrine does not operate to preclude evidence from consideration of claims brought under 42 U.S.C. § 1983, the doctrine is relevant to a malicious prosecution claim because it could negate an essential element of the constitutional tort—probable cause to believe a subsequent criminal prosecution will be successful. *Cf. Boyd,* 336 F.3d at 76–77 (violation of *Miranda* rights must be considered in probable cause analysis of malicious prosecution claim to determine whether discovered evidence would be admissible at subsequent criminal proceeding).

violated his Fourth Amendment rights, the jury could consistently conclude that no officer could have acted in an objectively reasonable manner in charging Clynch with an offense the officer knew could not succeed for lack of admissible evidence. As such, defendants are not entitled to summary judgment on Clynch's malicious prosecution claim at this time.

### A. Connecticut Constitutional and State Law Claims

#### 1. Article First, §§ 7 and 9 of the Connecticut Constitution [18]

The parties correctly assume that the factual analysis on Clynch's Fourth Amendment *Terry* stop claim should be the same for his state constitutional claims. The Connecticut Supreme Court has stated that "[S]tandards [ ] which mirror those set forth by the United States Supreme Court in *Terry v. Ohio* . . ., with regard to fourth amendment analysis, govern the legality of investigatory detentions under article first, §§ 7 and 9 of our state constitution." *State v. Oquendo*, 223 Conn. 635, 654, 613 A.2d 1300 (1992); *see also State v. Lipscomb*, 258 Conn. 68, 75–79, 779 A.2d 88 (2001). Since the Court has concluded that there are genuine issues of material fact with respect to the constitutional validity of Chapman's initial stop of Clynch, defendants are not entitled to summary judgment on Clynch's state constitutional claims. The Court declines defendants' invitation to prognosticate whether the Connecticut Supreme Court would adopt a federal qualified immunity analysis.

### B. Intentional Infliction of Emotional Distress

■ Under Connecticut law, to prevail on a claim of intentional infliction of emo-

tional distress, a plaintiff must prove that (1) defendant intended to inflict emotional distress, or knew or should have known that emotional distress was a likely result of defendant's conduct; (2) defendant's conduct was extreme and outrageous; (3) defendant's conduct was the cause of plaintiff's distress; and (4) the emotional distress sustained by plaintiff was severe. *See Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210, 757 A.2d 1059 (2000). Extreme and outrageous conduct is defined as that which "exceeds all bounds usually tolerated by decent society." *Appleton*, 254 Conn. at 210, 757 A.2d 1059 (*quoting Petyan v. Ellis*, 200 Conn. 243, 254 n. 5, 510 A.2d 1337 (1986)).

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!

*Id.* at 210–11, 757 A.2d 1059 (quotation omitted).

■ Defendants' motion is grounded on two arguments: 1.) that there can be no finding of extreme and outrageous conduct if the Court concludes that defendants' actions were objectively reasonable or based on probable cause; and 2.) that, due to Clynch's failure to seek any medical care for his emotional distress, he cannot prove he sustained severe emotional distress. Both of defendants' arguments fail

---

**18.** Article first, § 7 of the Connecticut constitution states: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures. . . ."

§ 9 states: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

as bases for summary judgment. Trial is necessary to resolve the factual disputes on whether Chapman acted with reasonable suspicion in stopping Clynch, such that Chapman and Garofalo acted with probable cause in charging and filing criminal complaints against Clynch. *See McKelvie v. Cooper*, 190 F.3d 58, 63 (2d Cir.1999)(existence of genuine issues of material fact regarding whether searches were unreasonable and officers' conduct was otherwise protected by qualified immunity required reversal of summary judgment on plaintiff's intentional infliction of emotional distress claim for conduct the trial court concluded was not sufficiently outrageous).

 Trial is also necessary to permit a jury to make findings on severity in light of the Connecticut Supreme Court's determination that a jury award for intentional infliction of emotional distress may stand despite the absence of medical or other treatment. *See Berry v. Loiseau*, 223 Conn. 786, 808–811, 614 A.2d 414 (1992); *see also Schanzer v. United Tech. Corp.*, 120 F.Supp.2d 200, 217 (D.Conn.2000) ("There is no requirement under Connecticut law that a claim for emotional distress be supported by medical evidence. *See Berry ....*").[19]

## VII. Conclusion

For the reasons set forth above, defendants motion [Doc. # 18] is GRANTED on

plaintiff's claims under the Ninth Amendment, the Eighth Amendment, procedural and substantive due process under the Fourteenth Amendment, and the Fourth Amendment claim for false arrest, and DENIED with respect to plaintiff's Fourth Amendment unreasonable stop and malicious prosecution claims, the corollary Connecticut State Constitutional claims, and intentional infliction of emotional distress.

IT IS SO ORDERED.

---

**19.** Defendants' reliance on *Reed v. Signode Corp.*, 652 F.Supp. 129 (D.Conn.1986) and *Almonte v. Coca–Cola Bottling Co. Of New York*, 959 F.Supp. 569 (D.Conn.1997) is misplaced. In *Reed*, the district court's alternative holding was that defendants were entitled to summary judgment because plaintiff's testimony about the nature of his distress was insufficient to establish the required severe emotional distress. *See Reed*, 652 F.Supp. at 137. In *Almonte*, the district court, while refusing to resolve "whether a plaintiff must seek treatment to maintain a claim of [inten-tional infliction of emotional distress] under Connecticut law," *Almonte*, 959 F.Supp. at 575, held that "[evidence of medical treatment or counseling] would be required to defeat summary judgment on [the facts of this case]." *Id.; see also Birdsall v. City of Hartford*, 249 F.Supp.2d 163, 175 (D.Conn.2003)(Stating "[i]t is not clearly established that failure to seek medical treatment precludes a showing of severe emotional distress sufficient to establish a claim of intentional infliction of emotional distress").