04-5711(L)-cv, 04-5943-cv
Walczyk v. Rio

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2005

(Argued: April 3, 2006                                    Decided: August 1, 2007)

Docket Nos. 04-5711-cv(L), 04-5943-cv(XAP)

THOMAS WALCZYK, ELIZABETH WALCZYK, MAXIMINA WALCZYK, EACH
INDIVIDUALLY AND AS P.P.A. FOR MICHELLE WALCZYK, A MINOR CHILD,[1]

*Plaintiffs-Appellees-Cross-Appellants,*

—v.—

JAMES RIO, BRIAN KILLIANY, JAMES JEPSEN, WILLIAM TYLER,
ANGELA DESCHENES, AND SHAWN BROWN,

*Defendants-Appellants-Cross-Appellees.*

Before:
CABRANES, SOTOMAYOR, and RAGGI, *Circuit Judges.*

Interlocutory appeal from so much of an order of the United States District Court for

the District of Connecticut as (1) denied defendants qualified immunity on plaintiffs' federal

---

[1]We direct the Clerk of Court to change the official caption to comport with this
decision.

1

and state constitutional challenges to the execution of arrest and search warrants. Cross-appeal from so much of the order as (2) denied plaintiff Elizabeth Walczyk summary judgment on the liability element of her illegal search claim and (3) granted defendants summary judgment on Thomas Walczyk's claim of excessive bail.

REVERSED AND REMANDED on part of defendants' qualified immunity appeal. AFFIRMED in all other respects.

_____ Judge Sotomayor concurs in a separate opinion.

---

THOMAS R. GERARDE (John J. Radshaw, III, *on the brief*), Howd & Ludorf, LLC, Hartford, Connecticut, *for Defendants-Appellants-Cross-Appellees*.

JON L. SCHOENHORN (Jennifer L. Bourn, *on the brief*), Jon L. Schoenhorn & Associates, Hartford, Connecticut, *for Plaintiffs-Appellees-Cross-Appellants*.

---

REENA RAGGI, *Circuit Judge*:

In 2001, plaintiff Thomas Walczyk ("Walczyk") was convicted after a jury trial in Connecticut on state law charges of disorderly conduct, see Conn. Gen. Stat. § 53a-182(a)(2); reckless endangerment, see id. § 53a-64(a); and improper firearm storage, see id. § 29-37i. On appeal, the Connecticut Appellate Court reversed, holding that Walczyk's conviction violated federal and state law because it was based on incriminating evidence obtained through search warrants that were not supported by probable cause. See State v. Walczyk, 76 Conn. App. 169, 182, 818 A.2d 868, 876 (Conn. App. Ct. 2003). Thereafter, Walczyk,

2

his wife Maximina, his minor child Michelle, and his mother Elizabeth initiated this civil action, suing defendants, all members of the Farmington, Connecticut Police Department, in the United States District Court for the District of Connecticut (Robert N. Chatigny, *Chief Judge*), pursuant to 42 U.S.C. §§ 1983 and 1988 and Connecticut law for money damages arising from events relating to Walczyk's reversed conviction.

Although the district court granted defendants' motion for summary judgment with respect to some of plaintiffs' claims, defendants now pursue an interlocutory appeal from so much of the district court's order, entered on September 30, 2004, as denied them qualified immunity from plaintiffs' unlawful arrest and search claims. See Walczyk v. Rio, 339 F. Supp. 2d 385, 389-91 (D. Conn. 2004). Not surprisingly, plaintiffs defend that denial. At the same time, Elizabeth Walczyk cross-appeals the district court's denial of her motion for summary judgment on the liability element of her challenge to the search of her home. See id. at 391. Meanwhile, Thomas Walczyk cross-appeals the award of summary judgment to defendants on his Eighth Amendment claim that he was detained on excessive bail. See id. at 390.

For the reasons discussed herein, we conclude that the arrest of Thomas Walczyk and the search of the home he shared with his wife and daughter were supported by probable cause. We reverse so much of the district court's order as concluded otherwise, and we remand with directions to enter summary judgment in favor of defendants on that part of plaintiffs' complaint. With respect to defendants' search of Elizabeth Walczyk's home, we

affirm the district court's denial of qualified immunity to defendants because the warrant authorizing that search was procured on the basis of plainly stale information and questions of fact remain as to whether any or all defendants acted knowingly or recklessly in misleading the issuing magistrate as to the currency of that information. Those same questions of fact prompt us to affirm the district court's denial of summary judgment to Elizabeth Walczyk on the liability element of her unlawful search claim. Finally, with respect to Walczyk's excessive bail claim, we affirm the award of summary judgment in favor of defendants on the ground of absolute immunity.

## I.    Factual Background

### A.    The Underlying Land Dispute

#### 1.    Barberino Realty Acquires the Land

This case has its origins in a longstanding property dispute between the Walczyk family and Barberino Realty and Development Corporation ("Barberino"). The property — undeveloped land adjacent to the Farmington homes of Thomas Walczyk at 28 Tunxis Street and of his parents, Elizabeth and Lucien Walczyk,[2] at 27 Tunxis Street — was acquired by Barberino in 1973. Over the next two decades, Barberino encountered various difficulties developing the land, only some of which are relevant to this appeal.

#### 2.    1981: Walczyk Brandishes a Rifle at Barberino Workers

Sometime in 1981, a Barberino work crew entered onto the undeveloped land to drill

---

[2]Lucien Walczyk is not a party to this lawsuit, having died prior to its commencement.

4

for soil samples preliminary to development. Thomas Walczyk, who was licensed to possess numerous firearms, brandished a rifle at the workmen and challenged their actions. The workmen sought police assistance, after which their work proceeded apparently without interruption and without any official action being taken against Walczyk.

The incident nevertheless prompted Barberino's counsel to seek assurances from Elizabeth and Lucien Walczyk that there would be no further attempts to hinder development of the land. In response, an attorney for the elder Walczyks advised that his clients were claiming title to the undeveloped land by adverse possession. The claim was based on the Walczyks' long use of a portion of the undeveloped land for vegetable gardening and cattle grazing.

### 3.     1988: Walczyk Again Brandishes a Gun at a Barberino Worker

Despite these 1981 events, the relationship between the Walczyks and Barberino appears to have remained uneventful until January 1988 when, in response to a Barberino demand that the Walczyks remove certain items from the property, the elder Walczyks reiterated their adverse possession claim.

A few months later, in March 1988, a Barberino worker equipped with a bulldozer attempted forcibly to remove various items from the disputed property. Once again, Thomas Walczyk confronted the worker with a licensed firearm, specifically, an AR-15 automatic assault rifle loaded with thirty rounds of ammunition, and ordered him off the property. Police responded to the scene and directed Walczyk to drop his weapon. Walczyk initially

ignored several such directives, "yell[ing] about trespassing and some statute." Police Rpt., Mar. 24, 1988, at 2. When Walczyk finally put down the rifle, a "wrestling match[]" ensued as he tried to prevent the police from taking him into custody. Id. at 3. Charged with threatening, reckless endangerment, and interfering with police, Walczyk eventually pleaded guilty to the lesser infraction of creating a public disturbance.

### 4. The Walczyks' Lawsuits Claiming Adverse Possession

The following month, in April 1988, Elizabeth and Lucien Walczyk sued for adverse possession of the undeveloped property. The action settled in 1991 with Barberino paying the elder Walczyks $20,000 and granting them a perpetual agricultural easement over a portion of the disputed land. In return, Elizabeth and Lucien Walczyk signed a quitclaim of any right, title, or interest in the property and promised not to oppose Barberino's development plans before the town planning and zoning commission.

Four years later, in January 1995, Thomas Walczyk sued Barberino, as well as his parents, claiming that he held title to the disputed property through adverse possession. On March 14, 1997, the Connecticut Superior Court rejected Walczyk's claim as a matter of law.[3] In granting judgment to Barberino and quieting title in its favor, the Connecticut court

_____

[3]In addition to holding that Walczyk failed to adduce evidence sufficient to establish any of the elements of adverse possession, the court ruled that his claim was barred by the equitable doctrines of unclean hands and laches because he had "initiated and directed" his parents' 1988 suit against Barberino and made the strategic choice to pursue that claim and its settlement only in their name. See Walczyk v. Barberino Realty, Inc., No. cv-950465712S, 1997 Conn. Super. LEXIS 715, at *35 (Conn. Super. Ct. Mar. 14, 1997) ("The plaintiff, by his failure to disclose his own claim in a timely fashion, effectively misled the

6

stated: "Thomas Joseph Walczyk has no estate, interest in or encumbrance of said real property or any part thereof." Walczyk v. Barberino Realty & Dev. Corp., No. cv-950465712S, 1997 Conn. Super. LEXIS 718, at *2 (Conn. Super. Ct. Mar. 14, 1997). This judgment was affirmed on direct appeal, see Walczyk v. Barberino Realty & Dev. Corp., 48 Conn. App. 911, 719 A.2d 1233 (Conn. App. Ct. 1998), and the Connecticut Supreme Court declined further review, see Walczyk v. Barberino Realty & Dev. Corp., 245 Conn. 904, 719 A.2d 1165 (1998).

B.  Events Relating to the Challenged Arrest and Searches

1.  Walczyk's April 1999 Threat to "Take Matters Into My Own Hands"

Despite the state courts' unequivocal rejection of his adverse possession claim, Walczyk persisted in asserting a superior interest in the disputed land. On April 9, 1999, he visited the Farmington Police Department to complain about Barberino's development efforts, insisting to defendant Captain James Rio that he (Walczyk) "had a common law right to the land because he had been farming and maintaining it for some time." Arrest Warrant Aff. at 2. When Rio explained that the police had received notice of the court order to the contrary, Walczyk stated that he expected to secure reversal of that judgment based on witness perjury and judicial misconduct. More significantly for purposes of the issues raised on this appeal, Walczyk told Rio that, "[i]f you guys don't comply with what I'm telling you

_____

defendants [in the settlement of that claim] . . . and now seeks to take unfair advantage of a strategic decision he made, with the advice of counsel, to prosecute the first adverse possession claim in his parents' names only.").

I'll take matters into my own hands." Id. Rio warned Walczyk not to do anything illegal, but Walczyk stated that he would "do what [he] had to do to protect his property." Id. (alteration in original).

### 2. Walczyk's August 1999 Reference to a Potential "Bloodbath"

Some five months later, on August 30, 1999, Walczyk called the Farmington police to complain again that Barberino personnel were trespassing on the disputed property. Responding to the scene, Officer David Hebert explained to Walczyk that the police could not act on his trespass complaint without some documentary support for his property claim. In his report of the encounter, Hebert noted that Walczyk made "some off color com[m]ents that the police were not taking the action needed to avoid a 'blood bath.'" Police Rpt., Aug. 30, 1999, at 1.[4]

At Walczyk's subsequent criminal trial, Hebert explained that, although he considered this remark offensive, he did not immediately place Walczyk under arrest because the officer did not feel any direct threat to himself. Nevertheless, he did understand Walczyk's comment as a threat toward "the Barberino Corporation and who[m]ever they were going to have down there working." Trial Tr. vol. 1, 56, Mar. 23, 2001. Indeed, Hebert informed Barberino of the bloodbath statement, prompting its counsel to contact Captain Rio to request

---

[4]Walczyk acknowledged the comment at his deposition in this case: "I said well here's the law. It's got a thousand years of history behind it and it's clearly designed to prevent blood shed and disputes over property. Now if a blood bath ensues, are you going to be responsible, being the police, because they refused to uphold the law." Walczyk Dep. at 77.

8

police protection at the disputed property site during any work periods.

### 3. The Challenged Arrest and Search Warrants

Soon thereafter, Rio reviewed Hebert's report of his August 30, 1999 encounter with Walczyk. Rio was, of course, aware of Walczyk's earlier statement that, if police did not assist him in his land dispute, he would take matters into his "own hands" and do what he "had to do" to protect his rights. Moreover, Rio knew that Walczyk was the licensed owner of a variety of firearms and that, over the years, he had responded to various situations by displaying, discharging, or threatening to discharge a firearm. In addition to the 1981 and 1988 incidents, detailed supra at **[5-6]**, during which Walczyk had brandished firearms specifically at Barberino workers, these situations included a 1990 road-rage incident during which Walczyk, armed with a loaded AK-47 rifle, confronted an angry motorist who had followed him home;[5] a 1992 complaint by neighbors that Walczyk shot a cat in his backyard;[6] and a 1996 argument during which Walczyk threatened to shoot his brother John for using the undeveloped land for driving practice.[7]

---

[5]Although Walczyk was initially charged with threatening, the state's attorney ultimately declined prosecution.

[6]Originally charged with unlawful discharge of a firearm, cruelty to animals, and conspiracy to commit cruelty to animals, Walczyk ultimately pleaded guilty to breach of the peace.

[7]John Walczyk told police that he did not fear imminent physical injury during this argument in which no firearms were actually displayed; nevertheless, he felt nervous because he knew his brother owned guns and could act on his threat. No charges were filed in connection with this incident.

9

Viewing the bloodbath comment in this larger context, Rio concluded that the events of August 30, 1999, demonstrated probable cause to arrest Walczyk for the Connecticut Class A misdemeanor of threatening, see Conn. Gen. Stat. § 53a-62(a),[8] and to search Walczyk's home and that of his parents for firearms that could be used as instrumentalities of the bloodbath threat. Rio did not speak with Officer Hebert before making this determination, but he did consult with a state's attorney, who concurred in the captain's probable cause assessment.

Rio then communicated the relevant circumstances to defendant Sergeant William Tyler and directed him to prepare the paperwork necessary to procure an arrest warrant for Walczyk. After Tyler completed and signed the arrest warrant, he and Rio used the same information to prepare search warrant applications for the homes of Thomas Walczyk and his parents. These papers were then given to defendants Corporal Angela Deschenes and Officer Shawn Brown, who acted as affiants for the search warrant applications. On

---

[8]At the time of the events in question, section 53a-62(a) stated:

> A person is guilty of threatening when: (1) By physical threat, he intentionally places or attempts to place another person in fear of imminent serious physical injury, or (2) he threatens to commit any crime of violence with the intent to terrorize another, to cause evacuation of a building, place of assembly, or facility of public transportation, or otherwise to cause serious public inconvenience, or (3) he threatens to commit such crime in reckless disregard of the risk of causing such terror or inconvenience.

Conn. Gen. Stat. § 53a-62(a) (1999) (amended 2001 & 2002). All citations herein are to this version of the provision.

10

September 4, 1999, a magistrate authorized the arrest and search warrants.[9]

          4.      Facts Supporting the Warrants

Because plaintiffs claim, inter alia, that the warrant affidavits, on their face, fail to establish probable cause to support the challenged arrest and searches, we here reproduce the facts as detailed in the affidavits:

> On 08-30-99, Officer Hebert of the Farmington Police Department responded to [a] trespassing complaint made by Mr. Thomas Walczyk . . ., 27 Tunxis Street, Farmington, CT. Walczyk complained of trespassing by employees of the Barberino Realty & Development Corporation on property located on Tunxis Street. Walczyk has had a long standing dispute over that property and has made claims in the past that he has common law rights to the land. Walczyk told Officer Hebert that the Farmington Police were not taking the action needed to avoid a "bloodbath."
>
> Officer Hebert reported Walczyk's complaint to Mr. [Stephen] Barberino Jr., the owner of the land in question. As a result of Walczyk's threat of a "bloodbath," Atty Robert Reeve, representing Barberino, contacted Capt. James Rio of the Farmington Police Department. Reeve expressed concerns for the safety of employees during imminent construction work planned for the Tunxis Street property. He requested extra police presence during work periods.
>
> In the early spring of 1999, the Farmington Police Department received a letter from Barberino Jr.'s attorney along with a copy of a March 14, 1997 decision made by the State of Connecticut Superior Court regarding the issue of the land in question. The decision by Judge Christine E. Keller was in favor of Barberino Realty & Development Corp., and stated that "Thomas Joseph Walczyk has no estate, interest in or encumbrance of said real property or any part thereof."
>
> During late winter of 1998 and early spring of 1999 Walczyk came to the

_____

[9] We use the term "magistrate" as a general term for a judicial officer in the State of Connecticut.

Farmington Police Department to speak with Capt. Rio about the land dispute and the impending land development. He told Capt. Rio at that time that he had a common law right to the land because he had been farming and maintaining it for some time. Walczyk said that he was in the process of getting a Superior Court ruling to reverse the one made in Barberino's favor. He claimed that Stephen Barberino Jr. had perjured himself and the presiding Judge had acted inappropriately. Capt. Rio explained that the Farmington Police had been advised of the ruling in favor of Barberino and that until we were officially notified otherwise, all parties and the police department would have to abide by the last court ruling. Walczyk responded that, "If you guys don't comply with what I'm telling you I'll take matters into my own hands." Capt. Rio advised Walczyk against any illegal actions to which Walczyk responded that he would, " . . . do what [he] had to do to protect his property."

The Farmington Police Department has investigated Walczyk on previous occasions for incidents involving threatening during which times he has either threatened the use of or displayed a gun.

On 09-15-96 Officer Charette of the Farmington Police Department investigated a disturbance on Tunxis Street involving Walczyk and his brother. The argument was over property on Tunxis Street for which Thomas Walczyk was suing his parents. His brother claimed that Walczyk pushed him and threatened to shoot him. His brother felt no imminent threat but was concerned because he knew Walczyk owned numerous guns. Walczyk denied making the threat and no arrest was made.

On 02-15-92 Walczyk was arrested in Farmington for cruelty to animals and unlawful discharge of a firearm. Neighbors reported seeing him shoot a cat on his property with a handgun.

On 12-08-90 neighbors complained that Walczyk was shooting guns on property at the end of Tunxis Street. He was shooting but was not in violation.

On 07-30-90 Walczyk was arrested by the Farmington Police for threatening. A motorist followed Walczyk home to complain about the way he was driving. Walczyk went inside and came back with a A-K assault rifle and an argument ensued. The assault rifle was taken as evidence. It was loaded with twenty rounds of ammunition.

On 03-24-88 the Farmington Police Department responded to a disturbance at

Tunxis Street. The disturbance was over the same land dispute between Walczyk and Barberino employees. Barberino employees were working on the land. Walczyk approached them carrying an AR 15 assault rifle ordering them to get off his property. One of the employee[]s complained that Walczyk had pointed the gun directly at him. Walczyk was arrested for threatening, reckless endangerment, and interfering with police. He denied actually pointing the gun at anyone. The gun was seized as evidence. It contained one .223 round in the chamber and twenty-nine rounds in the magazine. Walczyk fought with officers prior to being arrested.

As of 09-03-99, Walczyk, according to Connecticut State Police records, has the following handguns registered in his name.
1.   Colt model 1903, 32 caliber, ser. #: 354507.
2.   Colt Govt. Model, 45 caliber, ser. #: 40562G70.
3.   Smith & Wesson model 629, 44 caliber, ser. #: N872450.
4.   Walthers Woodsman model, .22 caliber, ser. #: 142639.
He also has the following assault weapons registered in his name.
1.   Non-classified, 86S, ser. #: A000316.
2.   Ruger (SR), Mini-14, ser. #: 18465824.
3.   Colt, AR15-A2 H-BAR, ser. #: 325465.
4.   Non-classified, MAK-90, ser. #: 9362979.

That a review of Farmington Police records indicate[s] that Walczyk has maintained residences at both 27 and 28 Tunxis St., Farmington, CT. That town of Farmington property records show that 27 Tunxis Street is owned by Lucian Walzak [sic], and 28 Tunxis Street is owned by Thomas Walzak [sic].

Search Warrant Aff. and App. at 2-3.[10]

>     5.   Execution of the Warrants

The challenged warrants were executed on September 7, 1999. On that date, defendant Sergeant James Jepsen contacted Thomas Walczyk and, on the pretense of wishing to discuss the land dispute, proposed a meeting at the police station. Upon Walczyk's arrival,

---

[10]The arrest warrant affidavit contained identical facts, but did not include the last paragraph describing the Tunxis Street residences.

Sergeant Tyler placed him under arrest and detained him in a cell block on $10,000 bail.[11] Walczyk remained in custody until later that day, when his mother posted bail.

While Walczyk was in custody, a team of officers, including Sergeant Jepsen and defendant Detective Brian Killiany executed the challenged search warrants, seizing nearly 60 licensed firearms from Thomas Walczyk's home and 18 licensed firearms from his parents' home, as well as approximately 2,600 rounds of ammunition, gun clips, ammunition belts, and other items related to firearms' use.

C.     Connecticut's Invalidation of the Challenged Warrants

After a Connecticut jury found Walczyk guilt of disorderly conduct, see Conn. Gen. Stat. § 53a-182(a)(2); reckless endangerment, see id. § 53a-64(a); and two counts of improper firearm storage, see id. § 29-37i,[12] he was sentenced to pay a fine of $100 for each count of conviction.

The Appellate Court of Connecticut reversed Walczyk's conviction, holding that the search warrant that resulted in seizure of the charged guns was not supported by probable cause. See State v. Walczyk, 76 Conn. App. at 180-82, 818 A.2d at 875-76.[13] In reaching

---

[11]Under Connecticut law, police officers are empowered to set temporary bail. See Conn. Gen. Stat. § 54-63c(a) (discussed infra at **[43-45]**).

[12]Walczyk was acquitted on four other counts of improper firearm storage; risking injury to a child, see Conn. Gen. Stat. § 53-21; and threatening, the charge that had initially prompted his arrest and the search of his and his parents' homes.

[13]Although plaintiffs note that this decision was authored by former Connecticut Supreme Court Chief Justice Ellen A. Peters, they do not argue that this ruling is dispositive in this case. See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998) (noting that

14

this conclusion, the court faulted the warrant's supporting affidavit for failing "to reconcile a construction of the 'bloodbath' statement as a threat . . . with the statement . . . of what the defendant actually had said." Id. at 180, 818 A.2d at 875. Specifically, the court held that "[a] statement to a police officer that the police needed to act to avoid a 'bloodbath' cannot be the basis of probable cause to believe that the defendant, at that time or in the immediate future, would engage in threatening behavior." Id. at 181-82, 818 A.2d at 876 (emphasis in

argument not raised on appeal is deemed waived). Nor is it likely that such an argument would be convincing in light of numerous decisions declining to hold individual state officials bound, in their individual capacities, by determinations adverse to the state in prior criminal cases. See Jenkins v. City of New York, 478 F.3d 76, 85-86 (2d Cir. 2007) (holding that ruling in New York state criminal proceeding that defendant's arrest was not supported by probable cause did not collaterally estop police from relitigating question when defendant sued them under § 1983); Bilida v. McCleod, 211 F.3d 166, 170-71 (1st Cir. 2000) (holding that collateral estoppel did not bar Rhode Island officers sued under § 1983 from asserting legality of searches found unconstitutional in earlier criminal proceedings: "[T]he interests and incentives of the individual police [officers] . . . are not identical to those of the state, and the officers normally have little control over the conduct of a criminal proceeding"); McCoy v. Hernandez, 203 F.3d 371, 374-75 (5th Cir. 2000) (same re: suit against Texas officers); Kinslow v. Ratzlaff, 158 F.3d 1104, 1105-06 (10th Cir. 1998) (same re: Oklahoma officers); Kraushaar v. Flanigan, 45 F.3d 1040, 1050-51 (7th Cir. 1995) (reaching same result regarding an Illinois officer); Duncan v. Clements, 744 F.2d 48, 51-52 (8th Cir. 1984) (same under Missouri law); Davis v. Eide, 439 F.2d 1077, 1078 (9th Cir. 1971) (same with respect to California officers). While we need not conclusively decide the issue, there is no reason to think Connecticut law would support a different conclusion regarding estoppel in this case. See, e.g., State v. Fritz, 204 Conn. 156, 173, 527 A.2d 1157, 1166 (1987) (observing that privity necessary to trigger collateral estoppel is not established "from the mere fact that persons may happen to be interested in the same question or in proving or disproving the same facts. While the concept of privity is difficult to define precisely, it has been held that a key consideration for its existence is the sharing of the same legal right by the parties allegedly in privity." (internal quotation marks and citation omitted)), overruled on other grounds by State v. Crawford, 257 Conn. 769, 779-80, 778 A.2d 947, 954 (2001); accord Tevolini v. Tevolini, 66 Conn. App. 16, 22 n.6, 783 A.2d 1157, 1163 n.6 (Conn. App. Ct. 2001).

15

original).  The Connecticut court also noted that the affidavit failed to establish probable cause because it did not state that any of Walczyk's earlier misconduct had resulted in his "<u>conviction</u> of threatening or of any other crime," distinguish "between recent incidents and those that ha[d] become stale," or state that his firearm possession was in any way unlawful. Id. at 180, 818 A.2d at 875 (emphasis in original).  Nor did the court think that Walczyk's prior statement to Captain Rio — that "he would take matters into his own hands and do what he had to do to protect his property" — established probable cause because Rio advised Walczyk "not to do so," and, on August 30, 1999, Walczyk "<u>followed instructions</u> to report any possible trespass to the police."  Id. at 181, 818 A.2d at 876 (emphasis in original).

D.     The District Court Action

On August 30, 2002, plaintiffs commenced this action, charging defendants with (1) violating their federal and state constitutional rights to have arrests and searches supported by probable cause, (2) depriving them of their federal rights to equal protection of the laws and to free expression, (3) violating their federal and state constitutional rights to bear arms, and (4) holding Walczyk on excessive bail.  Defendants moved for summary judgment, which the district court granted with respect to all claims except those challenging Thomas Walczyk's arrest, the searches of his and his parents' homes, and Walczyk's First Amendment claim, which apparently had been previously abandoned.

We need not here discuss the district court rulings with respect to the plaintiffs' equal protection or right to bear arms claims because neither is challenged on this appeal.  As for

16

Walczyk's excessive bail claim, the district court ruled "as a matter of law" that "when a police officer sets temporary bail under Conn. Gen. Stat. § 54-63c, he performs a judicial function and hence has absolute immunity from suit." Walczyk v. Rio, 339 F. Supp. 2d at 390.

With respect to plaintiffs' unlawful arrest and search challenges, the district court concluded that, although the supporting warrants were "facially valid," defendants were not entitled to summary judgment on the ground of qualified immunity because questions of fact existed as to whether they had "knowingly and deliberately, or with reckless disregard of the truth, made material misstatements or omissions in the warrant affidavit[s] that were necessary to the finding of probable cause." Id. at 389; see Franks v. Delaware, 438 U.S. 154, 155-56 (1978). The court identified three such material omissions: the affidavits' failure to disclose that (1) the defendants "had not spoken with Officer Hebert about his conversation" with Walczyk, (2) none of Walczyk's previous arrests "had resulted in a conviction for threatening," and (3) Walczyk "had not lived at 27 Tunxis Street for seven years." Walczyk v. Rio, 339 F. Supp. 2d at 389. The court concluded that "[a] reasonable juror could find that the omission of the first two items of information was critical to the finding of probable cause for the arrest, and that the omission of all three items was critical to the finding of probable cause for the searches of the houses and the seizures of the firearms." Id. Thus, it ruled that defendants were not entitled to summary judgment on the basis of qualified immunity under either federal or state law (assuming arguendo that

17

Connecticut would afford immunity to state constitutional claims[14]) because, when the record was viewed in the light most favorable to the plaintiffs, "a jury could find that the defendants lacked even arguable probable cause to believe that [Walczyk] had committed the crime of threatening or that the firearms to be seized were connected with criminal activity." Id. at 390 (noting that ruling was consistent with Connecticut Appellate Court's determination that affidavits "fell well short of establishing probable cause").[15] Nevertheless, the district court

---

[14]We need not decide on this appeal whether Connecticut affords qualified immunity in cases of unlawful searches or seizures. See Rustici v. Malloy, No. cv-970164460S, 2004 Conn. Super. LEXIS 1734, at *46 n.26 (Conn. Super. Ct. July 1, 2004) (assuming that "qualified immunity appl[ies] to state constitutional claims"). Our holding that probable cause supports the arrest of Walczyk and the search of his home, see infra at **[31-38]**, obviates the need for an immunity shield — state or federal — on those claims. See, e.g., Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." (internal quotation marks and citation omitted)); Beinhorn v. Saraceno, 23 Conn. App. 487, 492, 582 A.2d 208, 210-11 (Conn. App. Ct. 1990) (stating that claim for false arrest under Connecticut law requires proof that arresting officer lacked probable cause). As to Elizabeth Walczyk's unlawful search claim, because we identify factual issues, see infra at **[41-43]**, that could moot defendants' qualified immunity claim, we conclude that the availability of state law immunity need not be addressed unless and until these issues are resolved favorably to the defendants.

[15]To the extent Captain Rio claimed that the evidence was insufficient to ascribe supervisory responsibility to him for any warrant deficiencies, the district court concluded that sufficient evidence had been adduced to support a jury finding that Rio was actually "involved in preparing the warrant affidavit." Walczyk v. Rio, 339 F. Supp. 2d at 390. Because we agree with this conclusion, see Hayut v. State Univ. of New York, 352 F.3d 733, 753 (2d Cir. 2003) (noting that supervisory liability is supported by "evidence of a supervisory official's personal involvement in the challenged conduct" (internal quotation marks omitted)), it is unnecessary for us to distinguish between Rio and the other defendants in discussing the probable cause question that is the crux of plaintiffs' unlawful search and arrest challenges.

18

denied Elizabeth Walczyk's cross-motion for summary judgment on the liability phase of her search warrant challenge, concluding that she had not shown that no reasonable juror could find defendants' acts lawful.

## II. Discussion

### A. Jurisdiction and the Standard of Review

Because the denial of a motion for summary judgment is not a final judgment, it is generally not immediately appealable. See, e.g., Jones v. Parmley, 465 F.3d 46, 54 (2d Cir. 2006). An exception obtains, however, when the denied motion was based on a claim of immunity, at least to the extent the immunity claim presents a "purely legal question." Mitchell v. Forsyth, 472 U.S. 511, 530 (1985) (recognizing jurisdiction to review "purely legal question on which . . . claim of immunity turns"); see O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 38 (2d Cir. 2003) (observing that "[u]nder the collateral order doctrine . . . the denial of a qualified-immunity-based motion for summary judgment is immediately appealable to the extent that the district court has denied the motion as a matter of law, although not to the extent that the defense turns solely on the resolution of questions of fact"); accord Jones v. Parmley, 465 F.3d at 54. The rationale for this exception is the law's recognition that immunity shields a defendant from suit itself, not merely from liability. See Saucier v. Katz, 533 U.S. 194, 199 (2001) ("The privilege is 'an immunity from suit rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial.'" (quoting Mitchell v. Forsyth, 472 U.S. at 526 (emphasis in original))). In this

19

case, defendants' appeal from the district court's denial of qualified immunity on plaintiffs' search and arrest claims can be decided as a matter of law; accordingly, our jurisdiction is established.

Although an interlocutory appeal would not be available from either the denial of Elizabeth Walczyk's motion for summary judgment on her unlawful search claim or the district court's dismissal of Walczyk's excessive bail claim on the ground of absolute immunity, we elect to exercise pendent jurisdiction over both. "[W]e may exercise pendent jurisdiction over . . . issues that are not ordinarily subject to interlocutory review only when: (1) they are 'inextricably intertwined' with the determination of qualified immunity; or (2) their resolution is 'necessary to ensure meaningful review' of the district court's ruling on qualified immunity." Jones v. Parmley, 465 F.3d at 64 (quoting Swint v. Chambers County Comm'n, 514 U.S. 35, 51 (1995)). As we explain further below, see infra at **[42-43]**, Elizabeth Walczyk's claim is "inextricably intertwined" with the determination of defendants' entitlement to qualified immunity in that the same disputed factual issues that preclude a finding of qualified immunity on this claim at this stage also make summary judgment inappropriate. As to Walczyk's excessive bail claim, if we were to determine that the district court improperly granted defendants absolute immunity, they might nonetheless be entitled to qualified immunity, and thus review of this determination is also inextricably intertwined with our resolution of defendants' entitlement to qualified immunity. Cf. Clynch

20

v. Chapman, 285 F. Supp. 2d 213, 219 n.6 (D. Conn. 2003) (characterizing absolute immunity in excessive bail claim as a "cousin issue" to qualified immunity).

We review de novo defendants' legal challenge to the district court's qualified immunity ruling, see Jones v. Parmley, 465 F.3d at 55, as well as Elizabeth and Thomas Walczyks' cross-appeals from other summary judgment rulings, see, e.g., Root v. Liston, 444 F.3d 127, 130 (2d Cir. 2006).

B.     Plaintiffs' Search and Arrest Claims

1.     The Qualified Immunity Standard

When a defendant officer charged with violations of federal constitutional rights invokes qualified immunity to support a motion for summary judgment, a court must first consider a threshold question:  Do the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right?  If the answer to this question is no, "there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. at 201; see X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 66 (2d Cir. 1999) (observing that resolution of this first question favorable to defendant "moots" further inquiry into qualified immunity).  The reason for this rule is that, where there is no viable constitutional claim, defendants have no need of an immunity shield.  See generally Farrell v. Burke, 449 F.3d 470, 499 n.14 (2d Cir. 2006) ("Because we have found no cognizable violation of [p]laintiff's rights in this case, we need not reach the question of qualified immunity."); Holcomb v. Lykens, 337 F.3d 217, 223-25 (2d Cir. 2003) (declining to decide

qualified immunity question and affirming summary judgment on ground that, as a matter of law, defendants did not violate plaintiff's due process rights).

Only if the answer to the first question is yes must a court proceed to the inquiry for qualified immunity: Was the right at issue clearly established at the time of the defendant's actions? As the Supreme Court has explained, this question is not answered by reference to how courts or lawyers might have understood the state of the law: "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. at 202 (emphasis added). If the right at issue was not clearly established by then existing precedent, then qualified immunity shields the defendant. Even if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context. Malley v. Briggs, 475 U.S. 335, 341 (1986); accord Iqbal v. Hasty, – F.3d –, 2007 WL 1717803, at * 20 (2d Cir. June 14, 2007). Cerrone v. Brown, 246 F.3d 194, 202 (2d Cir. 2001); Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995); see Saucier v. Katz, 533 U.S. at 208 (holding officer entitled to qualified immunity if "[a] reasonable officer in [his] position could have believed that [the challenged conduct] was within the bounds of appropriate police responses"). In this respect, the Supreme Court has observed that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. at 341 (quoted

22

approvingly in Saucier v. Katz, 533 U.S. at 202).[16]

---

[16]Our concurring colleague takes exception to these standards at the same time that she acknowledges their reiteration of well established precedent.  Her concern that a bifurcation of the "clearly established" inquiry might allow a defendant to secure qualified immunity for conduct already held unconstitutional "in the particularized sense," post at **[SS Concurrence at 6-7]** is, in fact, unwarranted.  If controlling authority has already established the unlawfulness of the challenged conduct in the particularized circumstances presented in the pending case, then no reasonable officer could think otherwise and, thus, qualified immunity would not shield the defendant.  See, e.g., Groh v. Ramirez, 540 U.S. 551, 564 (2004).

Judge Sotomayor's further criticism — that determining clearly established law by reference to disagreements among reasonably competent officers, as indicated in Malley v. Briggs, 475 U.S. at 341, is "more permissive of defendants" than a single reasonable officer standard, post at **[SS Concurrence at 8]**— might merit attention if Malley contemplated "officers of reasonable competence" disagreeing based on unreasonable views of existing law.  In fact, neither Malley nor today's decision supports that conclusion.  Instead, what Malley does is provide courts with a useful tool for assessing when pre-existing law that did not recognize the invoked right in the particularized context at issue, nevertheless, "must" have alerted the defendant to the unlawfulness of his action.  See Anderson v. Creighton, 483 U.S. 635, 640 (1987) (holding that, where particular action at issue has not previously been held unlawful, defendant is not entitled to qualified immunity if, "in the light of pre-existing law the unlawfulness must [have] be[en] apparent").  By instructing courts to focus on whether "officers of reasonable competence could disagree" about the illegality of the challenged conduct, Malley sounds a useful reminder: because law enforcement work relies on probabilities and reasonable suspicions in an almost infinite variety of circumstances, many requiring prompt action, there can frequently be a range of responses to given situations that competent officers may reasonably think are lawful.  Within this range, an officer enjoys qualified immunity for "reasonable mistakes."  Saucier v. Katz, 533 U.S. at 205, 206.

To the extent Judge Sotomayor's objection to Malley's formulation relies on recent Supreme Court habeas jurisprudence, we note that the considerations informing limitations on habeas review are sufficiently distinct from those prompting recognition of qualified immunity to preclude easy analogy.  See, e.g., Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982) (recognizing qualified immunity because of "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority").  Nothing in the Supreme Court's qualified immunity jurisprudence signals a narrowing of these considerations or an abandonment of Malley's analysis.  To the contrary, as we note in text, Saucier v. Katz cites approvingly to Malley's

23

## 2. The Legality of the Challenged Arrest and Searches

Applying these principles to this case, we consider first whether defendants' actions violated plaintiffs' rights under both the United States and Connecticut Constitutions to be free from unreasonable searches and arrests. See U.S. Const. amend. IV;[17] Conn. Const. art. First, §§ 7, 9.[18] Ordinarily, an arrest or search pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause. See Franks v. Delaware, 438 U.S. at 171; United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003); Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991);

observation that qualified immunity is intended to shield "'all but the plainly incompetent or those who knowingly violate the law.'" 533 U.S. at 202 (quoting Malley v. Briggs, 475 U.S. at 341).

Finally, insofar as Judge Sotomayor expresses some concern about courts contemplating persons reaching different reasonable conclusions about the same facts, we note simply that courts do so routinely in upholding jury verdicts as long as "any rational trier of fact" could have reached the challenged result. United States v. MacPherson, 424 F.3d 183, 187 (2d Cir. 2005) (and cases cited therein).

Accordingly, we hold that courts may continue to rely on Malley in resolving qualified immunity disputes.

[17]"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

[18]"The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation." Conn. Const. art. First, § 7.

"No person shall be arrested, detained or punished, except in cases clearly warranted by law." Id. art. First, § 9.

see also United States v. Leon, 468 U.S. 897, 913-14 (1984). Plaintiffs nevertheless insist that the presumption is defeated in this case because (1) the warrant affidavits, on their face, fail to demonstrate probable cause, see generally United States v. Leon, 468 U.S. at 923; and (2) the issuing magistrate was, in any event, misled into finding probable cause by material omissions for which defendants were knowingly or recklessly responsible, see Franks v. Delaware, 438 U.S. at 155-56; Golino v. City of New Haven, 950 F.2d at 870-71.

a.      The Probable Cause Standard

Before discussing these two contentions, we observe that federal and Connecticut law are identical in holding that probable cause to arrest exists when police officers have "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); see State v. James, 261 Conn. 395, 415, 802 A.2d 820, 833 (2002) ("Probable cause exists when the facts and circumstances within the knowledge of the officer and of which he has reasonable trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that a [crime] has been committed." (internal quotation marks omitted)). Similarly, under both federal and state law, probable cause to search is demonstrated where the totality of circumstances indicates a "fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); accord United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004); State v.

25

Vincent, 229 Conn. 164, 171, 640 A.2d 94, 98 (1994) (noting that valid search requires "probable cause to believe that the particular items to be seized are connected with criminal activity or will assist in a particular apprehension or conviction" and "that the items sought to be seized will be found in the place to be searched"); State v. Orellana, 89 Conn. App. 71, 80, 872 A.2d 506, 516 (Conn. App. Ct. 2005) (citing Illinois v. Gates, 462 U.S. at 231-32)). Accordingly, we need not separately discuss federal and state law in assessing probable cause for the challenged arrest and searches.

As the Supreme Court has famously observed, probable cause is "a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. at 232; see United States v. Gaskin, 364 F.3d at 456. While probable cause requires more than a "mere suspicion," of wrongdoing, Mallory v. United States, 354 U.S. 449, 455 (1957), its focus is on "probabilities," not "hard certainties," Illinois v. Gates, 462 U.S. at 231. In assessing probabilities, a judicial officer must look to "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Id. (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); accord United States v. Gaskin, 364 F.3d at 456. "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place" in a probable cause determination. Illinois v. Gates, 462 U.S. at 235. Nor can probable cause be analogized to a prima facie case. See id. (observing that "'only the probability, and not a prima facie showing, of criminal activity'" is necessary to establish probable cause to search

26

or arrest (quoting <u>Spinelli v. United States</u>, 393 U.S. 410, 419 (1969))). In sum, probable cause does not demand any showing that a good-faith belief be "correct or more likely true than false." <u>Texas v. Brown</u>, 460 U.S. 730, 742 (1983). It requires only such facts as make wrongdoing or the discovery of evidence thereof probable.

It has long been recognized that, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court. See <u>Stewart v. Sonneborn</u>, 98 U.S. 187, 194 (1878) (observing that whether facts alleged to show probable cause are true is a matter of fact, "but whether, supposing them to be true, they amount to a probable cause, is a question of law" (internal quotation marks omitted)); accord <u>Director Gen. of R.R.'s v. Kastenbaum</u>, 263 U.S. 25, 28 (1923) (observing that where facts are in dispute, court submits the question of probable cause to the jury, but "with instructions as to what facts will amount to probable cause if proved"); <u>Sanders v. Palmer</u>, 55 F. 217, 220 (2d Cir. 1893) (holding that question whether facts, "supposing them to be true, . . . amount to a probable cause, is a question of law"; when the facts are disputed, "it is the duty of the court to instruct the jury what facts, if established, will constitute a probable cause . . . and to submit to them only the question as to the existence of those facts"); see also <u>United States v. Awadallah</u>, 349 F.3d at 65 (distinguishing between <u>de novo</u> review of legal question whether undisputed facts support probable cause and deferential review of factual question whether, in case of misstated or omitted material facts, affiant's actions were deliberate or reckless). In this case, there can be no dispute as to what facts the

27

defendants relied on to establish probable cause for the challenged arrest and searches; they are memorialized in warrant affidavits. Thus, whether the affidavits, on their face, demonstrate probable cause, is a question of law. In answering that question, however, a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate, see Illinois v. Gates, 462 U.S. at 238-39 (holding that duty of reviewing court "is simply to ensure that the magistrate had a substantial basis" for probable cause determination (internal quotation marks omitted)); accord Velardi v. Walsh, 40 F.3d 569, 574 n.1 (2d Cir. 1994), mindful of the well established principle that a showing of probable cause cannot be negated simply by demonstrating that an inference of innocence might also have been drawn from the facts alleged, see United States v. Webb, 623 F.2d 758, 761 (2d Cir. 1980); see also United States v. Forero-Rincon, 626 F.2d 218, 222 (2d Cir. 1980).

To the extent plaintiffs argue, in addition to their facial challenge, that material omissions infected the issuing magistrate's probable cause determination, there is no dispute between the parties as to what purported omissions are appropriately considered. They are the three non-disclosures identified by the district court, i.e., that (1) defendants had not spoken with Officer Hebert about his understanding of Walczyk's bloodbath statement; (2) none of Walczyk's prior arrests had resulted in a conviction for threatening, and (3) Walczyk had not lived at his parents' home for seven years. See Walczyk v. Rio, 339 F. Supp. 2d at 389. The materiality of these omissions presents a mixed question of law and fact. See

28

Velardi v. Walsh, 40 F.3d at 574.  Whether omitted information is "relevant to the probable cause determination" is a question of law that we review de novo.  Id.  If we identify relevancy, then questions of fact may arise as to what "weight . . . a neutral magistrate would likely have given such information," id., and whether defendants acted "deliberately or recklessly" in omitting the information from the warrant affidavits, United States v. Awadallah, 349 F.3d at 65 (internal quotation marks omitted).  Even in such circumstances, however, a court may grant summary judgment based on qualified immunity where "the evidence, viewed in the light most favorable to the plaintiffs, discloses no genuine dispute that a magistrate would have issued the warrant on the basis of the 'corrected affidavits.'" Velardi v. Walsh, 40 F.3d at 574 (emphasis in original).

Mindful of these principles, we proceed to consider plaintiffs' warrant challenges, focusing first on the arrest of Thomas Walczyk and the search of his 28 Tunxis Street residence and then on the search of Elizabeth Walczyk's 27 Tunxis Street home.

### b.     Thomas Walczyk

#### (1)     The Facial Challenge

We reject as without merit Thomas Walczyk's contention that the challenged warrant affidavits, on their face, fail to state probable cause for his arrest or the search of his 28 Tunxis Street home.  The facts alleged establish probable cause to believe (1) that Walczyk had violated Connecticut law by "threaten[ing] to commit . . . [a] crime [of violence] in reckless disregard of the risk of causing . . . terror" to another person, Conn. Gen. Stat. § 53a-

29

62(a)(3), and (2) that Walczyk maintained in his residence firearms that, in light of past use, were relevant evidence that he intended to threaten violence and recklessly disregarded the threat's terrorizing effect.

The facts reveal that, on August 30, 1999, Walczyk complained to Officer Hebert that the police were not taking the action necessary to avoid a bloodbath. A reasonable person would understand the bloodbath reference as a prediction of probable violence between Walczyk and Barberino. More to the point, a reasonable person would understand from other facts alleged in the affidavits that Walczyk would likely be the person initiating any such violence. A few months earlier, Walczyk had stated to Captain Rio that, if the police did not assist him in his property dispute with Barberino, he would take matters into his "own hands," doing whatever he "had to do" to protect his property rights. Rio knew that what Walczyk frequently put into his hands to resolve disputes were loaded firearms that he stored in his home. In the past, Walczyk had brandished firearms retrieved from his home at various individuals, including Barberino workers on two occasions. On one of those occasions, the brandished weapon was a loaded automatic rifle and,[19] when police intervened, Walczyk initially defied their orders to put down the weapon and resisted arrest. Moreover, the affidavits demonstrated that Walczyk plainly knew how to fire his weapons;

---

[19]Although the warrant affidavits note that Walczyk denied pointing the rifle at Barberino workers, the magistrate judge had probable cause to conclude otherwise given that one of the workers specifically "complained that Walczyk had pointed the gun directly at him." Arrest Aff. at 3; Search Warrant Aff. and App. at 3.

he had used them to kill a cat on his property. Rio further knew that Walczyk's efforts to vindicate his property rights peaceably through the courts had failed. Under the totality of these circumstances, the issuing magistrate certainly had a substantial basis to conclude that, when Walczyk told police that their continued failure to assist him in his property dispute with Barberino would result in a bloodbath, he was effectively threatening to employ violence against Barberino employees with reckless disregard for the terror such a threat would cause when communicated to the intended victim.

We are, of course, mindful that a Connecticut appellate court has ruled otherwise. Observing that Walczyk's bloodbath statement was made to secure police assistance, that court concluded: "A statement to a police officer that the police needed to act to avoid a 'bloodbath' cannot be the basis of probable cause to believe that the defendant, at the time or in the immediate future, would engage in threatening behavior." State v. Walczyk, 76 Conn. App. at 181-82, 818 A.2d at 876 (emphasis in original). We respectfully disagree. Walczyk may have desired police assistance in his land dispute, but how he sought to compel that assistance was by threatening violence. Walczyk was, after all, the only person to have used an instrument of violence in connection with the land dispute. Given his prior brandishing of loaded firearms, it was certainly probable that Walczyk's bloodbath statement was a threat to use violence against Barberino workers if the police did not intervene in his favor (something they could not do in light of state court rulings). Whether Walczyk would, in fact, have acted on his threat is not determinative of whether it was probable that he had

31

made the threat with reckless disregard of the terror it would cause Barberino.[20]  We conclude that the affidavits, on their face, state facts reasonably supporting such a finding by the issuing magistrate.

Walczyk submits that the search warrant affidavit nevertheless failed to demonstrate that there was any connection between his present lawful possession of firearms and the alleged crime of threatening.  We are persuaded that the warrant affidavit states probable cause to believe that a search of Walczyk's home for firearms would produce evidence relevant to demonstrating that Walczyk had committed the offense of threatening.  At the time the search warrant affidavit was prepared, Walczyk's apparent possession of firearms constituted relevant evidence which could suggest that his intent in making the bloodbath remark was, in fact, to threaten violence.  See State v. Crudup, 81 Conn. App. 248, 260 n.14, 838 A.2d 1053, 1062 n.14 (Conn. App. Ct. 2004) (discussing intent element of threatening).  Specifically, a seizure of firearms from Walczyk's home could have shown that, at the time Walczyk made the bloodbath remark, he had the actual capacity to cause bloodshed.  Moreover, such a seizure following the authorized search could have served to corroborate witness accounts that Walczyk had used weapons against Barberino workers and others in the past, which in turn could have helped establish his reckless disregard of the bloodbath

---

[20]Walczyk does not fault the police for communicating his bloodbath statement to Barberino, much less suggest that he did not intend or foresee such communication.  Indeed, given the totality of circumstances, it may well have been irresponsible of the police not to have communicated the statement.

32

remark's terrorizing effect. In sum, Walczyk's possession of firearms was evidence relevant to the mens rea element of the crime because a factfinder could reasonably infer from such possession and from Walczyk's past use of firearms that his bloodbath statement was not idle hyperbole, but an intentional threat of violence made with reckless disregard of its potential to cause terror. As the search warrant affidavit makes clear, the police were aware that Walczyk had previously used his home to store the firearms he brandished in confrontations with others, including Barberino workers, and thus they had probable cause to believe that evidence relevant to his alleged threatening would turn up in a search of his home.

Accordingly, we hold that plaintiffs' facial challenge to the warrant affidavits in this case necessarily fails as a matter of law.[21]

### (2) Purported Omissions

Walczyk asserts that two of the three identified material omissions misled the issuing magistrate into erroneously finding probable cause to support his arrest and the search of his home.

---

[21]We also reject as without merit plaintiffs' argument that the search warrant, which simply sought "Firearms," was insufficiently particular and that the seizure of ammunition, gun clips, ammunition belts, and other items not named in the warrant violated the Fourth Amendment. Although requests to search for "evidence of a crime" violate the proscription against general warrants, see Groh v. Ramirez, 540 U.S. 551, 557-58 (2004), defendants' application to search for "Firearms" was sufficiently particular because any firearms in Walczyk's possession were relevant evidence that his bloodbath remark was an intentional threat of violence. Because we reach the same relevancy conclusion with respect to the ammunition, gun clips, and related firearms paraphernalia found in Walczyk's home, we conclude that these items were properly seized under the "plain view" doctrine. United States v. $557,933.89, 287 F.3d 66, 81 (2d Cir. 2002).

33

(a)     Failure to Speak With Officer Hebert

First, the district court pointed to defendants' failure to disclose that no officer had spoken directly with Officer Hebert, who would have revealed that he did not himself feel threatened by Walczyk's bloodbath statement. The conclusion is unconvincing both as a matter of law and fact.

Preliminarily, we observe that the law permitting one law enforcement officer to rely on the report of another in applying for a warrant nowhere requires direct consultation to ensure that the officer reviewing the report ascribes no more weight to the described facts than the reporter intended. See generally Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006); Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000); Velardi v. Walsh, 40 F.3d at 574. Indeed, we have specifically ruled that "a police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Martinez v. Simonetti, 202 F.3d at 635 (internal quotation marks omitted). Thus, we reject the suggestion that a law enforcement officer is guilty of a material omission when, in applying for a warrant, he fails to disclose that he has not spoken directly with a fellow officer on whose report he relies to establish probable cause.

Even if we were to assume, however, that the applicant officer's failure to ascertain that the reporting officer did not consider words he heard to be threatening was relevant to a determination of probable cause, that is not this case. Officer Hebert did understand Walczyk's bloodbath statement as a threat. At Walczyk's criminal trial, Hebert testified that

34

he did not understand Walczyk to be threatening him, but he most certainly did understand Walczyk to be threatening any Barberino employees who came onto the disputed property. As we have already noted, this understanding finds ample support in the totality of facts recounted in the warrant affidavits. In sum, because Hebert's subjective view of Walczyk's statement, if it had been solicited by defendants and reported to the issuing magistrate, would actually have reinforced rather than undermined probable cause, we conclude that a "corrected" warrant affidavit would raise no genuine dispute as to the magistrate's issuance of warrants for the arrest of Walczyk or the search of his home.

(b)     The Lack of a Prior Conviction for Threatening

A second purported omission is the defendants' failure to disclose that none of Walczyk's prior conduct had resulted in a conviction for threatening. This omission is hardly relevant. Certainly, nothing in the challenged affidavits wrongly insinuates that Walczyk had such a conviction. Absent such conduct, we expect that when a magistrate, mindful of the government's burden to demonstrate probable cause, reviews a warrant application that does not report a prior conviction for a particular crime, the magistrate assumes for purposes of determining whether the government has carried its burden that no such conviction exists. See generally Minnesota v. Dickerson, 508 U.S. 366, 376 (1993) (noting that probable cause requirement ensures against government action based on speculation). Moreover, as this court observed in Brown v. D'Amico, the law does not demand that an officer applying for a warrant "volunteer every fact that arguably cuts against the existence of probable cause,"

35

as long as he does "not omit circumstances that are critical" to its evaluation, 35 F.3d 97, 99 (2d Cir. 1994). It was the particulars of Walczyk's past conduct in using or threatening to use firearms to resolve disputes that was critical to the determination of the probability that his bloodbath statement constituted a threat of violence. This probability is in no way undermined by the lack of a prior conviction for threatening.

Because we identify no merit in Thomas Walczyk's facial challenge to the warrant affidavits authorizing his arrest and the search of his home, and because we determine as a matter of law that no alleged omissions were material to the issuance of these warrants, we conclude that he (as well as his wife and daughter) fails to demonstrate a viable unlawful search or arrest claim under federal or state law. Accordingly, we reverse the district court order denying defendants' summary judgment with respect to these plaintiffs' unlawful search and arrest claims, and we remand with directions to enter such a judgment.

c. Elizabeth Walczyk

(1) The Lack of Probable Cause

According to defendants, the theory for searching Elizabeth Walczyk's residence was that it probably contained firearms accessible to her son, constituting some further evidence that his bloodbath statement was a threat of violence. To the extent Elizabeth Walczyk joins in her son's facial challenge to the warrant affidavits and to his charged material omissions regarding Officer Hebert and Walczyk's criminal record, we have already explained why we reject these arguments. The district court, however, identified another omission that raises

36

greater concern with respect to the search of Elizabeth Walczyk's home.

The warrant affidavit reported that Thomas Walczyk was licensed to possess various firearms and that he maintained two neighboring residences where such firearms would likely be found: "[A] review of Farmington Police records indicate[s] that Walczyk has maintained residences at both 27 and 28 Tunxis St., Farmington, CT." Search Warrant Aff. and App. at 3. The implication was that Walczyk had maintained the residences recently. What the affidavit omitted, however, was the apparently undisputed fact that Walczyk had not resided at his mother's 27 Tunxis Street residence for more than seven years.

There can be no question that the omitted information was relevant to any assessment of probable cause. In evaluating probable cause, a magistrate is always required to consider whether the facts adduced in the warrant application "appear[] to be current, i.e., true at the time of the application," or whether they have "become stale." Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991). The law sensibly draws no bright-line rule for staleness. Rather, a magistrate is expected to consider the age of the facts in light of the conduct at issue with a view toward ensuring that probable cause exists at the time the warrant is to be executed, not simply at some past time. See id.; see also United States v. Martino, 664 F.2d 860, 867 (2d Cir. 1981) (observing that, in circumstances of continuing or ongoing conduct, as contrasted with isolated illegal acts, "the passage of time between the last described act and the presentation of the application becomes less significant"). Thus, where information is seven years old, a magistrate must be alerted to that fact to make a reasonable probable

37

cause determination.

As we have already observed, the question of what weight a magistrate would have given omitted relevant evidence is generally a question for the finder of fact. See Velardi v. Walsh, 40 F.3d at 574. In this case, however, we can conclude as a matter of law that non-disclosure of the staleness of the dual residency allegation was fatal to a demonstration of probable cause. Not only was the allegation seriously outdated, it was the sole support for a search of Elizabeth Walczyk's home. A comparison best makes this point. With respect to 28 Tunxis Street, the issuing magistrate could have inferred that Walczyk maintained guns at that address because he was licensed to possess such weapons and, on at least one occasion, he was actually seen retrieving a loaded assault rifle from that premises to brandish at a person with whom he had a dispute. Further, neighbors had reported seeing him fire a handgun on that property. By contrast, no facts were alleged indicating that Walczyk had ever stored or retrieved firearms from his parents' home, much less that he had done so in the seven years since last residing there. Defendants urged that inference simply from Walczyk's license to possess firearms and his purported residence at 27 as well as 28 Tunxis Street. Whatever questions might be raised about the strength of such an inference in any circumstance, it could not be drawn from a dual residency allegation that was seven years old.

Defendants submit that the search of Walczyk's 28 Tunxis Street residence "would have been meaningless" if he were "free to cross the street to his parents['] home, where he

formerly lived for many years, and have free access to other weaponry." Appellant's Br. at 30. This argument overlooks the fact that the warrant affidavit fails to allege any facts — apart from Walczyk's dual residency — suggesting that anyone ever stored guns at 27 Tunxis Street. The affidavit makes no mention of the fact that Lucien or Elizabeth Walczyk was licensed to possess guns. As we have recently reiterated, probable cause to search must be based on particularized information about the place to be searched, not simply on a target's "'mere propinquity to others independently suspected of criminal activity.'" United States v. Martin, 426 F.3d 86, 88 (2d Cir. 2005) (quoting Ybarra v. Illinois, 444 U.S. 85, 91 (1979)). Once the dual residency allegation is "corrected," we can conclude as a matter of law that the affidavit is devoid of any particularized information establishing probable cause to search Elizabeth Walczyk's home.

> (2) Defendants' Claim of Qualified Immunity; Elizabeth Walczyk's Motion for Summary Judgment on the Issue of Liability

Despite our ruling that the search of Elizabeth Walczyk's home was not supported by probable cause, defendants might still be entitled to claim qualified immunity from liability for damages if the search was supported by "arguable probable cause." Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (holding that, even in the absence of probable cause, officer "will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause'"). "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers

39

of reasonable competence could disagree on whether the probable cause test was met.'" Id. (quoting Golino v. City of New Haven, 950 F.2d at 870); see also Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002). Like the district court, we conclude that questions of disputed fact preclude a judicial resolution of this issue in favor of either side.

While no competent officer who knew that Thomas Walczyk had not resided in his parents' home for more than seven years could reasonably think that the stale allegation of dual residency established probable cause to search that premises for firearms, it cannot be determined from the present record which officers, if any, possessed — or even should have possessed — such knowledge. Further record development and factfinding are necessary to determine, among other things, (1) which of the defendants, if any, actually reviewed the police records that purportedly established Walczyk's residence at both 27 and 28 Tunxis Street; (2) whether these records would have alerted a reasonable officer to the staleness of the dual residency allegation; (3) which defendants, if any, possessed independent knowledge that the dual residency statement was not accurate; (4) the circumstances under which the dual residency allegation was communicated along the chain of defendants; and (5) whether any defendant's reliance on such communication without further inquiry was reasonable in light of the totality of the circumstances.[22] Because a resolution of some of these matters in

_____

[22]As the Supreme Court has explained:

[P]olice officers called upon to aid other officers in executing . . . warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of

40

favor of Elizabeth Walczyk could preclude one or more defendants from claiming that they acted with arguable probable cause in searching her home, the district court correctly concluded that defendants did not yet establish their entitlement to qualified immunity. On the other hand, because a resolution favorable to one or more defendants could afford them the benefit of a qualified immunity shield, the district court also correctly denied summary judgment on liability to Elizabeth Walczyk. Accordingly, we affirm both these rulings.

C.    Walczyk's Excessive Bail Claim

Connecticut law allows state police to set temporary bail in certain cases. See Conn. Gen. Stat. § 54-63c(a).[23] The district court dismissed Walczyk's excessive bail claim as a matter of law, holding that "when a police officer sets temporary bail" pursuant to this statute, "he performs a judicial function and hence has absolute immunity from suit."

---

probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest [or search] cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest [or search].

Whiteley v. Warden, 401 U.S. 560, 568 (1971); see also Varrone v. Bilotti, 123 F.3d 75, 81 (2d Cir. 1997) (concluding that subordinate officers carrying out search directive of superior were entitled to qualified immunity although none had determined basis for order or reliability of information on which it was based).

[23]The statute, in pertinent part, requires a police officer "promptly [to] order release of the arrested person upon the execution of a written promise to appear or the posting of such bond as may be set by the police officer, except that no condition of release set by the court or a judge thereof may be modified by such officer." Conn. Gen. Stat. § 54-63c(a) (emphasis added). An officer may set bail only after conducting an interview with the individual concerning the terms and conditions of release, at which interview counsel may be present. See id.

41

Walczyk v. Rio, 339 F. Supp. 2d at 390. Other district courts in Connecticut have similarly ruled. See Sanchez v. Doyle, 254 F. Supp. 2d 266, 269-73 (D. Conn. 2003); accord Machuca v. Canning, No. 3:00-cv-1722, 2006 WL 2828160, at *6 (D. Conn. Sept. 29, 2006); Minney v. Kradas, No. 3:01-cv-1543, 2004 U.S. Dist. LEXIS 5520, at *9-11 (D. Conn. Mar. 31, 2004); Bacciocchi v. Chapman, No. 3:02-cv-1403, 2004 U.S. Dist. LEXIS 1077, at *18-20 (D. Conn. Jan. 26, 2004); Clynch v. Chapman, 285 F. Supp. 2d at 219-23. Citing Sanchez and Clynch by analogy, this court recently concluded that absolute judicial immunity shielded a prosecutor who ordered a defendant's bond increased pursuant to Conn. Gen. Stat. § 54-63d because the prosecutor was performing a judicial function. See Root v. Liston, 444 F.3d at 132 (observing that courts apply "functional approach to immunity questions"). Following Root, we now hold what the citations to Sanchez and Clynch implied: police officers setting bail under Conn. Gen. Stat. § 54-63c(a) are engaged in a judicial function that affords them absolute immunity.

"It is . . . well established that officials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages." Montero v. Travis, 171 F.3d 757, 760 (2d Cir. 1999) (extending absolute immunity to parole board officials performing a quasi-judicial function in making parole decisions); see also Butz v. Economou, 438 U.S. 478, 511 (1978) (granting absolute immunity to administrative hearing examiners performing adjudicatory functions within federal agencies). As the Supreme Court has explained, it is "the nature of the function

performed, not the identity of the actor who performed it, that inform[s] our immunity analysis." Forrester v. White, 484 U.S. 219, 229 (1988) (holding that judges do not enjoy absolute immunity when performing administrative, legislative, or executive functions). Following this "functional approach to immunity questions," this court in Root v. Liston observed that "[o]rdinarily, it is judges who set bail, and judges enjoy absolute immunity when they do so." 444 F.3d at 132 (internal citations omitted). In short, because the setting of bail is a judicial function, see Cleavinger v. Saxner, 474 U.S. 193, 205 (1985), absolute immunity extends to police officers when they perform that function pursuant to statute.

Accordingly, we affirm the district court's dismissal of Walczyk's excessive bail claim.

### III.    Conclusion

To summarize:

1. The unlawful search and arrest challenges of Thomas, Maximina, and Michelle Walczyk are without merit as a matter of law because the warrants for Walczyk's arrest and for the search of these plaintiffs' home were supported by probable cause. Defendants are entitled to have summary judgment entered in their favor on these claims.

2. The warrant authorizing the search of Elizabeth Walczyk's home was plainly not supported by probable cause; nevertheless, the district court correctly denied summary judgment to both Elizabeth Walczyk and defendants because disputed questions of fact must be resolved before it can be determined whether defendants' actions are shielded by qualified

43

immunity or whether plaintiff is entitled to have a liability judgment entered in her favor.

3. Summary judgment was correctly entered in favor of defendants on Thomas Walczyk's claim of excessive bail because police officers, when setting bail pursuant to Conn. Gen. Stat. § 54-63c(a), perform a judicial function, which affords them absolute immunity from suit for money damages.

That part of the district court order denying defendants' summary judgment motion with respect to the unlawful search and arrest claims of plaintiffs Thomas, Maximina, and Michelle Walczyk is hereby REVERSED and the case is REMANDED for entry of such a judgment. In all other respects the appealed summary judgment rulings of the district court are AFFIRMED.

Sotomayor, J., concurring:

I agree fully with the outcome of this case, and I concur with most of the majority's reasoning; however, I disagree with its description of the qualified immunity standard we should apply and its related discussion of "arguable probable cause." A long line of decisions of this Court features the same doctrinal misstatements, and it is time we stopped repeating uncritically this particular language and gave it the attention it deserves.[1] I join all of the majority opinion except Part II(B)(1),[2] and I write separately to call the Court's attention to our collective failure to harmonize our qualified immunity analysis with the Supreme Court's directives.

The portion of the majority's qualified immunity discussion that I find objectionable reads as follows: "If the right at issue was not clearly established by then existing precedent, then qualified immunity shields the defendant. Even if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." Maj. Op. at **[23]** (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). These two sentences and the citation to *Malley* reveal the two flaws I see in this circuit's approach to qualified immunity. First, our approach splits the single question of whether a right is "clearly established" into two distinct steps,

---

[1] To the extent the majority holds that courts may continue to rely on this language from *Malley*, Maj. Op. at **[25 n.16]**, I note that such a holding is unnecessary and serves no purpose in this case except to complicate the law further.

[2] Although I also disagree with the majority's use of the term "arguable probable cause" and its reliance on whether "officers of reasonable competence could disagree," Maj. Op. at **[41]**, I join Part II(B)(2)(c)(2) of the majority opinion because I agree with its conclusion that questions of disputed fact preclude judicial resolution of whether the officers are entitled to qualified immunity for their search of Elizabeth Walczyk's house.

45

contrary to Supreme Court precedent. Second, we demand a consensus among all hypothetical reasonable officers that the challenged conduct was unconstitutional, rather than positing an objective standard of reasonableness to which defendant officers should be held, as the Supreme Court has repeatedly instructed us to do. I address both of these points in turn.

The Supreme Court has made clear that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his [or her] conduct was unlawful in the situation he [or she] confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). That is, whether a right is clearly established is *the same question* as whether a reasonable officer would have known that the conduct in question was unlawful. This Court's case law, in contrast, bifurcates the "clearly established" inquiry into two steps. *See, e.g.*, *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) ("A police officer is entitled to qualified immunity from liability for his [or her] discretionary actions if *either* (1) his [or her] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, *or* (2) it was objectively reasonable for him [or her] to believe that his [or her] actions were lawful at the time of the challenged act." (emphasis added; internal quotation marks and citation omitted)). By splitting the "relevant, dispositive inquiry" in two, we erect an additional hurdle to civil rights claims against public officials that has no basis in Supreme Court precedent.

Whether a reasonable officer would know his or her conduct to be unlawful requires an inquiry into the state of the law at the time of the conduct and "in light of the specific context of the case." *Saucier*, 533 U.S. at 201. If the right at issue has not previously been articulated, or had been addressed only in a factual context that is "distinguishable in a fair way," *id.* at 202, a reasonable

46

officer might not have known that the challenged conduct was unlawful.[3] *See also id.* ("'[T]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Contrary to what our case law might suggest, the Supreme Court does not follow this "clearly established" inquiry with a second, *ad hoc* inquiry into the reasonableness of the officer's conduct. Once we determine whether the right at issue was clearly established for the particular context that the officer faced, the qualified immunity inquiry is complete.

*Wilson v. Layne*, 526 U.S. 603 (1999), illustrates the inquiry that the Supreme Court contemplates for qualified immunity. The Wilsons brought suit against law enforcement officers who permitted members of the media to accompany them in an early morning raid of the Wilsons' home. *Id.* at 607. Having concluded that the officers' actions violated the Fourth Amendment, the Court considered whether the officers were entitled to qualified immunity. *Id.* at 614. The Court explained that "what 'clearly established' means in this context depends largely 'upon the level of generality at which the relevant "legal rule" is to be identified.'" *Id.* at 614 (quoting *Anderson*, 483 U.S. at 639). That is, to be clearly established, "[t]he contours of the right must be sufficiently clear

---

[3] The Supreme Court has stated, however, that the "clearly established" standard does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), nor does the standard necessarily require that the facts of earlier cases be "materially similar" to the case under consideration, *Hope v. Pelzer*, 536 U.S. 730, 739-41 (2002). The standard is one of "fair warning," *id.* at 741, such that "unlawfulness must be apparent" in light of pre-existing law, *Anderson*, 483 U.S. at 640.

47

that a reasonable official would understand that what he [or she] is doing violates that right." *Id.* at 615 (internal quotation marks omitted). The Court concluded that the officers were entitled to qualified immunity because it was "not obvious from the general principles of the Fourth Amendment," *id*. at 615-16, or judicial decisions that the presence of the media was unlawful, and "[g]iven [the] undeveloped state of the law, the officers . . . cannot have been expected to predict the future course of constitutional law," *id.* at 617 (internal quotation marks omitted).

*Wilson* confirms that whether an officer's conduct was objectively reasonable is part and parcel of the inquiry into whether the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred. To ask whether an officer's violation of an individual's right was objectively reasonable *after* we have found that the right was clearly established in the particularized sense finds no warrant in *Wilson*, *Saucier*, or any other recent Supreme Court discussion of qualified immunity. *See also Brosseau v. Haugen*, 543 U.S. 194, 199-200 (2004) (per curiam); *Groh v. Ramirez*, 540 U.S. 551, 563 (2004); *Hope v. Pelzer*, 536 U.S. 730, 739-46 (2002).

I suspect that our bifurcation of the "clearly established" analysis derives from the eminently reasonable principle that whether a right is clearly established "is not answered by reference to how courts or lawyers might have understood the state of the law." Maj. Op. at **[23]**. We do not expect law enforcement officers to keep abreast of every development in the case law or to recognize every implication of legal precedent for police conduct that courts have not previously considered. *See Saucier*, 533 U.S. at 205 ("It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."). But our bifurcated approach

48

makes too much of this principle by divorcing the reasonableness inquiry from the state of the law at the time of the conduct in question. The inquiry described by the Supreme Court already incorporates a recognition that police officers should not be expected to anticipate every application of legal principles because it requires that the right be clearly established with particularity for the conduct at issue.

In this case, the particularity requirement means that our "clearly established" inquiry is not complete upon reaching the indisputable conclusion that an individual has the right to be free from arrest, search, or seizure absent probable cause. *See Anderson*, 483 U.S. at 640-41. Rather, we must determine whether it was clearly established that the situation the officer confronted did not give rise to probable cause. *See id.* at 641 (holding that officials who "reasonably but mistakenly conclude that probable cause is present . . . should not be held personally liable"); *see also Saucier*, 533 U.S. at 206 ("[E]ven if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions."). In other words, based on the law at the time the conduct occurred, would a reasonable officer have known that his or her actions were not supported by probable cause, and therefore were in violation of the Fourth Amendment?

The majority opinion takes this question wholly outside of the "clearly established" inquiry and asks whether the officers had "arguable probable cause." *See* Maj. Op. at **[41]**. This Court has used the term "arguable probable cause" to describe the standard for finding that a defendant officer is entitled to qualified immunity for his or her reasonable but mistaken determination that probable cause existed in a particular context. *See Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)

49

("[I]n the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. This is because at its heart, [t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." (internal quotation marks and citations omitted; alteration in original)); *Cerrone*, 246 F.3d at 203.[4] We have also stated that "arguable probable cause" falls under the objective reasonableness determination of our qualified immunity test. *See Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007). Yet reasonableness—and therefore the existence of "arguable probable cause"—are considerations that properly fall *within* the clearly established inquiry as the Supreme Court has described it. *See Anderson*, 483 U.S. at 640-41; *Brosseau*, 543 U.S. at 199-201. It is not surprising, then, that "arguable probable cause" finds no mention in any Supreme Court opinion; the need for a separate term to describe this concept arises only once we have improperly splintered the "clearly established" inquiry. Because I believe "arguable probable cause" is both imprecise and an outgrowth of the first flaw in our qualified immunity analysis, I do not agree with the majority's use of the term.

I recognize that the distinction I am drawing is a fine one, but I believe it has real consequences. Our approach does not simply divide into two steps what the Supreme Court treats singly, asking first, whether the right is clearly established *as a general proposition*, and second, whether the application of the general right *to the facts of this case* is something a reasonable officer could be expected to anticipate. Instead, we permit courts to decide that official conduct was

---

[4] Other courts of appeals have also used the term "arguable probable cause" in a similar way as this Court. *See, e.g.*, *Williams v. Jaglowski*, 269 F.3d 778, 781-82 (7th Cir. 2001); *Jones v. Cannon*, 174 F.3d 1271, 1283 & n.3 (11th Cir. 1999).

"reasonable" even after finding that it violated clearly established law in the particularized sense. By introducing reasonableness as a separate step, we give defendants a second bite at the immunity apple, thereby thwarting a careful balance that the Supreme Court has struck "between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Anderson*, 483 U.S. at 639 (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)).

My second objection to the majority's formulation of the qualified immunity standard is that it treats objective reasonableness as turning on whether "officers of reasonable competence could disagree."[5] Maj. Op. at **[23]**. This language, which our cases frequently recite, *see, e.g.*, *Iqbal v. Hasty*, – F.3d –, 2007 WL 1717803, at *20 (2d Cir. June 14, 2007); *Cerrone*, 246 F.3d at 202; *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995), derives from the Supreme Court's 1986 decision in *Malley*, 475 U.S. at 341. Whether reasonably competent officers could disagree about the lawfulness of the conduct at issue, however, is not the same question the Supreme Court has repeatedly instructed us to consider: whether "it would be clear to *a reasonable officer* that his [or her] conduct was unlawful in the situation he [or she] confronted."[6] *Saucier*, 533 U.S. at 202

---

[5] This language also appears in the majority opinion as part of the explanation of "arguable probable cause." Maj. Op. at **[41]**. Notably, however, by stating that "[a]rguable probable cause exists if *either* (a) it was objectively reasonable for the officer to believe that probable cause existed, *or* (b) officers of reasonable competence could disagree on whether the probable cause test was met," *id.* (emphasis added; internal quotation marks and citation omitted), this passage seems to support the argument that whether "officers of reasonable competence could disagree" is *not* an objective reasonableness test. In addition, by adding two steps to the qualified immunity analysis beyond whether the particular right was clearly established, the majority's discussion of "arguable probable cause" further splinters our qualified immunity test.

[6] Although *Saucier* does not specifically refer to the reasonable officer's competence, I have no quarrel with the assumption that a "reasonable officer" is also a competent officer.

51

(emphasis added); *see also Brosseau*, 543 U.S. at 199 (quoting *Saucier*); *Groh*, 540 U.S. at 563 (same); *Hope*, 536 U.S. at 746 (same). As with our bifurcation of the "clearly established" inquiry, our requirement of consensus among all reasonable officers departs from Supreme Court dictates and unjustifiably raises the bar to liability for violations of constitutional rights.

Reasonable person standards are familiar constructs in the law. They define the level of prudence, care, or knowledge that the law will require of a defendant called to task for his or her actions. In the qualified immunity context, the reasonable officer embodies the minimum degree of judgment and awareness of the law that courts expect law enforcement officials to exercise in the conduct of their duties. That is, the reasonable officer standard sets the threshold beyond which a defendant officer will not be entitled to immunity. As I have discussed, to determine what conduct a reasonable officer should have known to be unlawful in the situation presented, a court must decide whether the law was sufficiently clear regarding the conduct at issue, such that the reasonable officer, and thus the defendant, would have had "fair notice that [his or] her conduct was unlawful." *Brosseau*, 543 U.S. at 198.

Asking whether "officers of reasonable competence could disagree" shifts this inquiry subtly but significantly. Instead of asking whether the defendant's conduct was beyond the threshold of permissible error, as the reasonable officer standard does, this inquiry affords a defendant immunity unless a court is confident that a range of hypothetical reasonably competent officers *could not disagree* as to whether the defendant's conduct was lawful. This standard is not only more permissive of defendants seeking to justify their conduct; it also takes courts outside their traditional domain, asking them to speculate as to the range of views that reasonable law enforcement officers

might hold, rather than engaging in the objective reasonableness determination that courts are well-equipped to make.

The Supreme Court has specifically criticized the conflation of an objective reasonableness standard with a requirement of unanimous consensus in the context of a petition for a writ of habeas corpus. In *Williams v. Taylor*, 529 U.S. 362 (2000), the Court interpreted the statutory provision allowing a federal court to grant review of a petition for a writ of habeas corpus when a state court judgment "involved an unreasonable application of[] clearly established Federal law," 28 U.S.C. § 2254(d)(1). The Fourth Circuit had previously held that a state court's adjudication involved an "unreasonable application" of federal law only if "the state court has applied federal law 'in a manner that *reasonable jurists would all agree is unreasonable.*'" *Williams*, 529 U.S. at 409 (quoting *Green v. French*, 143 F.3d 865, 870 (4th Cir. 1998) (emphasis added)). Both the majority and plurality Supreme Court opinions rejected the Fourth Circuit's interpretation of the "unreasonable application" standard, explaining that whether an application of the law is objectively unreasonable is a different, less stringent standard than one that asks whether reasonable jurists would unanimously find an application of law unreasonable. *See id.* at 409-10 (majority opinion) ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case."); *id.* at 378 (plurality opinion) ("As Congress is acutely aware, reasonable lawyers and lawgivers regularly disagree with one

another. Congress surely did not intend that the views of one such judge who might think that relief is not warranted in a particular case should always have greater weight than the contrary, considered judgment of several other reasonable judges.")[7] Our Court similarly has adopted an unjustifiably stringent standard in the qualified immunity context by prohibiting liability for constitutional violations where a court believes that one reasonably competent officer would find the conduct at issue lawful, even if the overwhelming majority would not.

Finally, I note that although we repeat *Malley*'s "officers of reasonable competence" test with regularity, and it appears frequently in the decisions of other federal courts of appeals, *see, e.g.*, *Brittain v. Hansen*, 451 F.3d 982, 988 (9th Cir. 2006); *Armstrong v. City of Melvindale*, 432 F.3d 695, 701 (6th Cir. 2006); *Wollin v. Gondert*, 192 F.3d 616, 625 (7th Cir. 1999), it has not appeared a second time in any majority opinion of the Supreme Court. It seems curious that we would continue to rest our qualified immunity standard on language the Supreme Court has carefully eschewed for over twenty years since *Malley* was decided.

In sum, the Supreme Court has struck a careful balance between the vindication of constitutional rights and government officials' ability to exercise discretion in the performance of their duties. Our case law, in subtle but important ways, has altered this balance in favor of defendants by adding another analytic step to the qualified immunity analysis and equating objective reasonableness with unanimity among "officers of reasonable competence." In the vast majority of

---

[7] This caution against transforming a reasonableness inquiry into a consensus requirement is instructive notwithstanding the plurality's statement that the particular statute at issue was not meant to codify the standard for qualified immunity into the law of habeas review. *See Williams*, 529 U.S. at 380 n.12 (plurality opinion).

54

cases, including this one, the particular phrasing of the standard will not alter the outcome of the qualified immunity analysis. There is no doubt in this case that a reasonable officer would believe that the arrest of Thomas Walcyzk, as well as the search of his home and the seizure of firearms found there, were lawful. Yet the effect in future cases may not always be so benign. What is more, the majority's framework introduces unnecessary complications into an already complicated qualified immunity analysis. It is time to eliminate these complications and reconcile our qualified immunity analysis with the Supreme Court's most recent, authoritative jurisprudence.